IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20090241-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (March 15, 2012) |
| Cameron Clint O'Bannon, | ) | |
| | ) | 2012 UT App 71 |
| Defendant and Appellant. | ) | |

-----

Fourth District, Provo Department, 051405003
The Honorable Samuel D. McVey

Attorneys:     Margaret P. Lindsay and Douglas J. Thompson, Provo, for Appellant
               Mark L. Shurtleff and Ryan D. Tenney, Salt Lake City, for Appellee

-----

Before Judges Orme, Roth, and Christiansen.

CHRISTIANSEN, Judge:

¶1     Defendant Cameron Clint O'Bannon appeals from his jury conviction of child abuse, a second degree felony. *See* Utah Code Ann. § 76-5-109(2)(a) (Supp. 2011).[1] O'Bannon asserts that the trial court erred in instructing the jury on the eggshell plaintiff doctrine because the instruction incorrectly explained the mental state the State

---

[1]Because the relevant portions of the Utah Code have not been substantively amended, we cite the current code throughout this opinion for the reader's convenience. *See* Utah Code Ann. § 76-5-109 amend. notes (2008 & Supp. 2011); *id.* § 76-2-103 amend. notes (2008).

was required to prove to obtain a conviction for second degree felony child abuse. We reverse and remand for a new trial.

BACKGROUND[2]

I. The Victim's Injuries

¶2 In the fall of 2005, a mother and her eleven-month-old son (the victim) moved into O'Bannon's home. A few weeks later, O'Bannon and the victim spent some time together without the mother present, after which the mother noticed that the victim was bruised under one of his eyes and on the bridge of his nose. She asked O'Bannon what had happened, and he explained that the victim hurt himself after falling over some lawn furniture.

¶3 On October 31, the mother left the house with her daughter to take O'Bannon's son to school and run some errands. Before they left, the mother's daughter put the victim in bed with O'Bannon, who was still asleep. After dropping off O'Bannon's son and eating breakfast, the mother noticed that she had missed two calls from O'Bannon to her cell phone. The mother called O'Bannon back immediately, and he asked her to rush home because something was wrong with the victim. O'Bannon explained to her that the victim was "barely conscious, and his breathing was shallow." The mother urged O'Bannon to call an ambulance, but he resisted doing so, instead insisting that she "hurry and get home." When the mother arrived at the house, an ambulance had arrived, apparently because O'Bannon had changed his mind and called for help. The paramedics described the victim as "extremely limp and unresponsive" and having "occasional jerking motions," which are symptoms that are "indicative of some head trauma or possible head injury."

¶4 O'Bannon told the police officer who responded with the ambulance that he had gone upstairs to gather some clothing for the children while the victim was at the bottom of the stairway playing, when O'Bannon heard "repeated thud sound[s]." O'Bannon stated that he went to the stairway and noticed the victim lying on his back at

---

[2]"When reviewing a jury verdict, we recite the facts in the light most favorable to that verdict." *State v. Carreno*, 2006 UT 59, ¶ 3, 144 P.3d 1152.

the bottom of the stairway. O'Bannon also testified that he attempted to revive the victim by "rubbing his belly."

¶5 Dr. Bruce Herman, who is an emergency medicine physician, a general pediatrician, and a child abuse pediatrician, treated the victim that night after he was transported from the Payson hospital to Primary Children's Medical Center in Salt Lake City. Although there were few external signs of severe injury, consisting only of a "few bruises here and there" and "a small mark on the top of his head," a CT scan showed "intra-cranial bleeding" or sub-dural hemorrhages of two different ages, i.e., "acute and sub-acute injury." Dr. Herman opined that the acute bleeding was less than three days old and the sub-acute bleeding appeared to be three days to two weeks old. Dr. Herman testified that he thought the "sub-dural hemorrhages . . . [were] traumatic in origin."

¶6 Dr. Herman also reported that the victim "had extensive bilateral retinal hemorrhages with retinoschisis." At trial, Dr. Herman described retinal hemorrhages as "bleeding at the back of the eye," and retinoschisis as "an actual splitting of layers of the retina," essentially, "a blood blister at the back of the eye." Dr. Herman testified that the victim's "retinal hemorrhages are at the most extreme [e]nd of severity, and have never been reported to have come from a non-fatal accidental cause."

¶7 Dr. Herman concluded that the "constellation" of the victim's injuries—the retinal hemorrhages, the retinoschisis, and the sub-dural hemorrhages—were "quite consistent with inflicted trauma by shaking or shaking with impact."[3] Dr. Herman's conclusion that the victim had been shaken that morning was supported by the victim's immediate symptoms of severe brain injury while he was still with O'Bannon. Dr. Herman did not believe the victim likely sustained the sub-dural hemorrhage and acute

---

[3]Dr. Herman explained that it was not the existence of any one of the victim's specific injuries that led to his conclusion that the victim had been intentionally harmed; rather, it was the combination of the severe injuries. Dr. Herman stated, "[W]hen we look at a child, we do [not] look at one finding in isolation. We have to look at all the findings and create a differential diagnosis for those—the constellation of findings."

bleeding from falling down the stairs.[4]  Dr. Herman opined that while the victim experienced increased intra-cranial pressure due to the swelling of the sub-dural hemorrhage, this increased pressure did not likely cause the extensive retinal hemorrhages and retinoschisis.

¶8     Dr. David Christopher Dries, a pediatric ophthalmologist, examined the victim's eyes the day after the victim was admitted to Primary Children's Medical Center and diagnosed the victim with "bilateral diffuse intra-retinal hemorrhages and hemorrhages in all of the retina on both eyes" and "retinoschisis."  At trial, Dr. Dries testified that "bilateral diffuse retinal hemorrhages with retinoschisis . . . is a pattern that is seen in non-accidental trauma."  Dr. Dries testified that the "pattern" of retinal hemorrhages and retinoschisis that he recognized in the victim was consistent with non-accidental trauma, such as shaking or shaking with impact.  Dr. Dries also did "not know of any study or case report or child from [his] personal experience that had this pattern of retinal hemorrhages from a fall down six stairs or seven stairs.  It takes far greater force for accidental trauma, far greater."  Finally, Dr. Dries did not believe that increased intra-cranial pressure caused the victim's retinal hemorrhages.

---

[4]Dr. Herman stated that a fall down the stairs

> sounds bad, because you hear a thump, and then you hear [a] series of more thumps, but what the literature would suggest is that these are a series of small falls. . . .  A fall from—say we have stairs from the top of this counter onto the floor.  A child who just keels over from the top of this counter onto the floor I would say has a much bigger chance of being injured as opposed to going down the steps from here to the floor, because each step sort of is another small fall.  So stairway falls can be thought of as a series of small falls.

When asked about what type of injury he would expect to see in a child falling down five to eight carpeted steps, Dr. Herman testified that he would not expect to see very severe injuries in such a situation, specifically stating, "[A] child who is carried by [his or her] caretaker and falls down the steps is more likely to be injured than someone who's just crawling or walking and falling down the steps."

## II. O'Bannon's Defense

¶9 At trial, O'Bannon presented a "re-bleed" defense supported by his expert witness, Dr. Robert Keith Rothfeder, formerly an emergency room physician and currently a physician in private practice with experience in treating traumatic injuries. As part of his current practice, Dr. Rothfeder consults in brain injury and child abuse cases. Dr. Rothfeder, who is also a lawyer, explained that the victim had a sub-dural hematoma with "old blood" and "fresh blood." The "old" sub-dural hematoma had a "'membrane' . . . like a scab" that formed after the old bleeding stopped. Dr. Rothfeder stated that "re-bleeding of an old sub-dural hematoma can occur with little force, and perhaps with no force[, but] from biological factors." Dr. Rothfeder testified "that a fall down [the] stairs is one of the things that could have caused a re-bleed of that old sub-dural hematoma" even though the old and new bleeding occurred in two different areas of the brain. In Dr. Rothfeder's opinion, the victim's injury occurred on October 31, which caused re-bleeding of the victim's old sub-dural hematoma (the preexisting hematoma). This re-bleeding, he testified, would have "increase[d the victim's] intra-cranial pressure over time." Dr. Rothfeder believed that the victim's retinal hemorrhages and retinoschisis were likely caused by the increasing pressure of the re-bleeding of the sub-dural hematoma rather than by a new, acute injury.

¶10 O'Bannon took the stand and testified that he "did [not] hurt [the victim]," did not shake or strike the victim, and "would never hurt [the victim] in any way. . . ," stating, "[H]e was one of my own kids."

## III. The Jury Instructions

¶11 Several of the instructions given to the jury explained the elements of second degree felony child abuse, *see* Utah Code Ann. § 76-5-109(2)(a) (Supp. 2011). O'Bannon's stipulation that the victim had suffered a serious physical injury resulted in Instruction No. 9, which instructed the jury to "find [that] this element of the [charged] offense has been prove[n] beyond a reasonable doubt." *See generally id.* § 76-5-109(1)(f) (defining "serious physical injury"); *id.* § 76-5-109(2)(a). Instruction No. 4 tracked the language of second degree felony child abuse, *see id.* § 76-5-109(2)(a) ("Any person who inflicts upon a child serious physical injury or, having the care or custody of such child, causes or permits another to inflict serious physical injury upon a child is guilty of an offense as follows: (a) if done intentionally or knowingly, the offense is a felony of the

second degree . . . .”). And Instruction No. 6 defined what it means to be “engag[ing] in conduct” either “intentionally” or “knowingly.” *See id.* § 76-2-103(1)-(2) (2008). The jury was also provided additional explanations regarding intent in Instructions Nos. 7 and 8. Instruction No. 7 stated, in part,

> Intent, being a state of mind, is seldom susceptible of proof by direct and positive evidence and must ordinarily be inferred from acts, conduct, statements and circumstances. Thus, *you would be justified in inferring that a person must have intended the natural and probable consequences of any act purposely done by him or her*.

(Emphasis added.) Instruction No. 8 provided in part, “*As the jury, you may infer a defendant's intent from a voluntary act which produces as its natural and probable consequence an unlawful result.* You are instructed that circumstantial evidence is competent to prove that the defendant had the specific intent required when he committed the acts charged.” (Emphasis added.)

¶12 After O'Bannon presented his re-bleed defense, the State proposed Instruction No. 9A because it was concerned that O'Bannon's re-bleed theory would confuse the jury about the cause of the victim's severe injuries. In particular, the State wanted the jury to be instructed that it could find O'Bannon criminally responsible for inflicting serious physical injury on the child even if O'Bannon's shaking of the victim caused only re-bleeding of an older injury. Instruction No. 9A stated, “In criminal law the injurer takes his victim as he finds him. When injury ensues from deliberate wrongdoing, even if it is not an intended consequence, the injurer is responsible at law without the law concerning itself with the precise amount of harm inflicted.”

¶13 The trial judge gave Instruction No. 9A over O'Bannon's objection,[5] stating, “I believe this princip[le] is one that's fairly long-standing in the law, and we will allow this instruction to be given,” contingent on the prosecutor's statement to the jury that the instruction would not apply if it found that the victim had fallen down the stairs. Ultimately, the jury found O'Bannon guilty of second degree felony child abuse. After

---

[5]With the exception of Instruction No. 9A, O'Bannon does not challenge any of the jury instructions on appeal.

trial, O'Bannon filed motions to arrest judgment and for a new trial on the ground, inter alia, that Instruction No. 9A was erroneous. The trial court denied O'Bannon's motions. O'Bannon appeals only the trial court's issuance of Instruction No. 9A.

## ISSUE AND STANDARD OF REVIEW

¶14    O'Bannon challenges Instruction No. 9A, asserting that it incorrectly stated the law and erroneously applied the "eggshell plaintiff doctrine," which originated in tort law, to a criminal matter. O'Bannon contends that Instruction No. 9A allowed the jury to find him criminally responsible for second degree felony child abuse without a determination that he intentionally or knowingly caused the victim serious physical injury. *See generally* Utah Code Ann. § 76-5-109(2)(a) (Supp. 2011). O'Bannon argues that this erroneous jury instruction prejudiced him and that we should therefore reverse his conviction and sentence and remand for a new trial.

¶15    "[W]e review jury instructions in their entirety to determine whether the instructions, taken as a whole, fairly instruct the jury on the applicable law." *State v. Malaga*, 2006 UT App 103, ¶ 18, 132 P.3d 703 (alteration in original) (internal quotation marks omitted). "Whether a jury instruction correctly states the law presents a question of law which we review for correctness." *State v. Houskeeper*, 2002 UT 118, ¶ 11, 62 P.3d 444. If "a jury instruction is erroneous, we will reverse only if the defendant shows a reasonable probability the error affected the outcome of his case." *State v. Perez*, 2002 UT App 211, ¶ 22, 52 P.3d 451 (internal quotation marks omitted); *accord State v. Davis*, 2007 UT App 13, ¶ 6, 155 P.3d 909.

## ANALYSIS

¶16    In reviewing the jury instructions as a whole, we determine that the trial court did not "fairly instruct the jury on the applicable law," *see Malaga*, 2006 UT App 103, ¶ 18 (internal quotation marks omitted). We agree with O'Bannon that Instruction No. 9A confused the mental state required for a second degree felony child abuse conviction by stating that the jury could find O'Bannon guilty of second degree felony child abuse without determining that he intended to cause or knowingly caused the victim serious

physical injury. We also agree with O'Bannon that he was prejudiced as a result of the erroneous jury instruction.

## I. The Eggshell Jury Instruction Inaccurately Stated the Law.

### A. Elements for a Conviction Under Utah Code Section 76-5-109(2)(a)

¶17    We begin our analysis of the validity of Instruction No. 9A with a discussion about the mental state element of second degree felony child abuse. O'Bannon and the State fundamentally disagree about the mental state the State was required to prove at trial to convict O'Bannon of second degree felony child abuse. *See generally* Utah Code Ann. § 76-2-103(1)-(2) (2008) (defining the mental states "intentionally" and "knowingly"); *id.* § 76-5-109(2)(a) (Supp. 2011) (stating the elements of second degree felony child abuse). We determine that Instruction No. 9A inaccurately stated the law with regard to the mental state required for the jury to find O'Bannon guilty of second degree felony child abuse.

¶18    According to O'Bannon, the required mental state under Utah Code section 76-2-103(1)-(2) depends on whether the crime charged is a "conduct-based crime" or a "result-based crime." *See generally id.* § 76-2-103(1)-(2) (2008). "A conduct-based crime," he asserts, "is a crime where the statute prohibits engaging in certain conduct or behavior often regardless of whether or not the conduct causes any result," and "[a] result-based crime prohibits causing a certain result regardless of the means by which it is achieved." Therefore, in the context of a conduct-based crime, "a person engages in conduct intentionally . . . with respect to the nature of his conduct" when he "desire[s] to engage in the conduct" or when he is "aware of the nature of his conduct." *See id.* In the context of a result-based crime, "[a] person engages in conduct [] intentionally" when he "desire[s] to . . . cause the result" or "acts . . . with knowledge[] with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *See id.* O'Bannon argues that the legislature intended for second degree felony child abuse to be a result-based crime.

¶19    O'Bannon illustrates his position with an example of a person who intended to firmly hug a child or infant and did not intend the hugging to result in injury, but who nevertheless caused serious physical injury upon the child or infant. O'Bannon argues that the person's conduct of hugging would be criminalized because the person

intended to engage in the hug. O'Bannon asserts that the legislature did not intend for the person's conduct in such circumstances to be criminalized where he or she did not intend to cause harm, especially not the serious physical injury required for a second degree felony conviction. O'Bannon thus argues that the child abuse statute clearly provides that in order for him to be found guilty of second degree felony child abuse, "the State must prove [beyond a reasonable doubt] that he either intended to cause [the victim] serious physical injury or knew that his conduct was reasonably certain to cause [the victim] serious physical injury."

¶20     By contrast, the State argues that O'Bannon was correctly convicted of second degree felony child abuse even if the State proved only that "the nature of [O'Bannon's] conduct" was intentional, *see id.* § 76-2-103(1), or that O'Bannon "[was] aware of the nature of his conduct or the existing circumstances," *see id.* § 76-2-103(2). The State emphasizes the disjunctive "or" in section 76-2-103(1)-(2), to assert that, in order to convict O'Bannon of child abuse as a second degree felony, it was required to prove only that O'Bannon intentionally or knowingly engaged in the conduct (shaking), *or* that O'Bannon intended to cause a particular result or knew that a particular result would occur, but that it is not required to prove *both* that O'Bannon engaged in the conduct *and* intended the result or knew the conduct was reasonably certain to cause the result. *See id.* § 76-2-103(1)-(2).

¶21     According to the State, O'Bannon could be convicted of second degree felony child abuse if he intended "the nature of his conduct" that "inflict[ed the] serious physical injury" on the victim regardless of whether he intended to actually cause the child a serious physical injury. *See id.* § 76-2-103(1); *id.* § 76-5-109(2)(a) (Supp. 2011). The State alternatively argues that O'Bannon could be found guilty of second degree felony child abuse if it proved that O'Bannon was aware of the nature of his conduct or the existing circumstances of his infliction of serious physical injury on the victim regardless of whether O'Bannon was aware that his conduct was reasonably certain to cause the result. *See id.* § 76-2-103(2) (2008); *id.* § 76-5-109(2)(a) (Supp. 2011). In other words, the State argues that it was only required to prove beyond a reasonable doubt that O'Bannon intended to shake the victim, not that O'Bannon intended to cause the victim serious physical injury. Were this not the result, the State argues, then a person who intentionally shakes a child could "avoid liability for any brain damage by claiming that she intended only to scare the child, not to seriously injure him."

¶22    Thus, the parties' contrary interpretations of section 76-5-109(2)(a) center on whether, to sustain a conviction for second degree felony child abuse in these circumstances, the State need only prove that O'Bannon acted intentionally because he "desire[d] to engage in the conduct" that caused the serious physical injury or acted knowingly because he knew that engaging in such "conduct [was] reasonably certain to cause" serious physical injury to the victim.  *See* Utah Code Ann. § 76-2-103(1)-(2) (2008); *id.* § 76-5-109(2)(a) (Supp. 2011).

¶23    We agree with O'Bannon's interpretation of the statute and determine that, for the jury to find him guilty of second degree felony child abuse, the State had the burden at trial of proving that O'Bannon intended his conduct to cause the victim serious physical injury or of proving that O'Bannon knew that his conduct was reasonably certain to cause the victim serious physical injury.

> When interpreting statutes, we first look to the plain language of the statute and give effect to that language unless it is ambiguous.  Thus, a statutory provision should be read literally, unless it would result in an unreasonable or inoperable result.  When examining the statutory language we assume the legislature used each term advisedly and in accordance with its ordinary meaning.
>
> Our duty to give effect to the plain meaning of a statute, however, should give way if doing so would work a result so absurd that the legislature could not have intended it.  Where a statute's plain language creates an absurd, unreasonable, or inoperable result, we assume the legislature did not intend that result.  To avoid an absurd result, we endeavor to discover the underlying legislative intent and interpret the statute accordingly.

*State v. Jeffries*, 2009 UT 57, ¶¶ 7-8, 217 P.3d 265 (citations and internal quotation marks omitted).

¶24    Utah Code section 76-5-109(2)(a) provides,

> Any person who inflicts upon a child serious physical injury
> or, having the care or custody of such child, causes or
> permits another to inflict serious physical injury upon a
> child is guilty of an offense as follows:  (a) if done
> intentionally or knowingly, the offense is a felony of the
> second degree . . . .

Utah Code Ann. § 76-5-109(2)(a) (Supp. 2011).  Section 76-2-103 defines the mental states of intentional and knowing:

> A person engages in conduct:  (1) Intentionally, or with
> intent or willfully with respect to the nature of his conduct
> or to a result of his conduct, when it is his conscious
> objective or desire to engage in the conduct or cause the
> result.  (2) Knowingly, or with knowledge, with respect to
> his conduct or to circumstances surrounding his conduct
> when he is aware of the nature of his conduct or the existing
> circumstances.  A person acts knowingly, or with
> knowledge, with respect to a result of his conduct when he is
> aware that his conduct is reasonably certain to cause the
> result.

*Id.* § 76-2-103(1)-(2) (2008).

¶25    Interpreted literally, section 76-5-109(2)(a) provides that a person who inflicts serious physical injury upon a child commits second degree felony child abuse if he or she intentionally engages in conduct that leads to the child's serious physical injury and (1) desires to engage in that conduct or (2) desires to cause the result. *See id.* § 76-2-103(1); *id.* § 76-5-109(2)(a) (Supp. 2011).  Alternatively, a person who inflicts serious physical injury upon a child commits second degree felony child abuse if he or she knowingly engages in conduct that leads to the child's serious physical injury and (1) is aware of the nature of his or her conduct or the existing circumstances or (2) is aware that his or her conduct is reasonably certain to cause the result. *See id.* § 76-2-103(2) (2008); *id.* § 76-5-109(2)(a) (Supp. 2011).  Additionally, the plain meaning of the word

"inflict" from the child abuse statute is "to give by or as if by striking <pain>" or " to cause (something unpleasant) to be endured." *See* Merriam-Webster's Collegiate Dictionary 641 (11th ed. 2003).

¶26    Interpreting section 76-5-109(2)(a) literally would lead to an unintended, unreasonable, and even absurd result.[6] *See Jeffries*, 2009 UT 57, ¶ 8. To avoid an unintended result, we read this statute to mean that second degree felony child abuse requires a culpable mental state that relates to the result of the conduct and not to the nature of the circumstances surrounding the conduct itself. That is, to be found guilty of second degree felony child abuse, the person must have intended to cause the victim serious physical injury or must have been aware that his or her conduct was reasonably certain to cause the victim serious physical injury. Moreover, we do not apply the word "inflict" to only non-accidental acts.

¶27    By way of example, literally interpreting section 76-2-103 as it applies to section 76-5-109(2)(a) would mean that a person who engages in innocent horseplay with a child could be convicted of second degree felony child abuse if the child suddenly falls off the person's back, hits his head, and suffers serious physical injury. The person thus inflicted serious physical injury upon the child and either desired to engage in the conduct or was aware of the nature of his or her conduct, even though he or she did not desire and was not aware that the conduct was reasonably certain to cause the child to fall and suffer a serious physical injury.

¶28    In our hypothetical example, however accidental it was, the person still *inflicted* the child's serious physical injury. If inflict meant only a non-accidental action against a person, it would preclude the criminalization of a reckless or criminally negligent action, something that is contrary to our statutes. Inflicting serious physical injury upon a child applies not only to intentional and knowing (second degree felony) child abuse, but also to reckless child abuse, *see id.* § 76-5-109(2)(b) (Supp. 2011) ("[I]f done recklessly, the offense is a felony of the third degree."), and to criminally negligent child abuse, *see id.* § 76-5-109(2)(c) ("[I]f done with criminal negligence, the offense is a class A misdemeanor."). Thus, under the statute, a defendant can inflict serious physical injury

---

[6]Our interpretation of section 76-2-103(1)-(2) is limited to second degree felony child abuse. *See* Utah Code Ann. § 76-2-103(1)-(2) (2008); *id.* § 76-5-109(2)(a) (Supp. 2011).

upon a child with different levels of culpable mental states, i.e., intentionally or knowingly, which imply non-accidental infliction of injury; or recklessly or negligently, which imply accidental infliction of injury.

¶29    Furthermore, were we to literally interpret the statute as requiring the State to prove only that one intended to engage in the conduct surrounding the injury to a child, then the general public might not know when conduct could possibly be criminalized in an instance where a person intended to engage in certain conduct even though they did not intend the serious physical injury that resulted.  Instead of that absurd result, it is far likelier that the legislature intended the public to understand that if a person intentionally or knowingly causes serious physical injury to a child, he or she commits a second degree felony regardless of *how* he or she causes the injury.

¶30    We also observe the following directive:

> The rule that a penal statute is to be strictly construed shall not apply to [the criminal] code, any of its provisions, or any offense defined by the laws of this state.  All provisions of [the criminal] code and offenses defined by the laws of this state shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law and general purposes of Section 76-1-104.

Utah Code Ann. § 76-1-106 (2008).  The general purposes of the criminal code, as described in section 76-1-104, include "[f]orbidd[ing] and prevent[ing] the commission of offenses" and "[d]efin[ing] adequately the conduct and mental state which constitute each offense and safeguard conduct that is without fault from condemnation as criminal."  *Id.* § 76-1-104(1)-(2).  In the context of second degree felony child abuse, applying the conduct portion of the intentional definition (desires to engage in that conduct), *see id.* § 76-2-103(1), and the knowing definition (is aware of the nature of his or her conduct or the existing circumstances), *see id.* § 76-2-103(2), would contradict the general purpose of the criminal code to "safeguard conduct that is without fault from condemnation as criminal," *see id.* § 76-1-104(2).  In *State v. Miller*, 2008 UT 61, 193 P.3d 92, the supreme court similarly declined to "[s]trictly constru[e] the term 'possesses'" in Utah Code section 58-37-8 when doing so would promote injustice to those innocently

possessing a controlled substance and would "create[] a myriad of absurd prosecutorial possiblities." *Id.* ¶¶ 20-21.

¶31   Consequently, we agree with O'Bannon that, to convict him of second degree felony child abuse, the State was required to prove that O'Bannon intended to cause the victim serious physical injury to the victim or that O'Bannon was aware that his actions were reasonably certain to cause serious physical injury to the victim. It follows that it is insufficient for a second degree felony child abuse conviction for the State to prove only that O'Bannon intended to be, or knew that he was, engaged in certain conduct without the requisite intent or knowledge that a serious physical injury would likely result from his commission of that conduct.

B.  The Eggshell Plaintiff Doctrine

¶32   Based upon our determination that the State was required to prove that O'Bannon intended to cause the victim serious physical injury or that he was aware that his actions were reasonably certain to cause the victim serious physical injury, we agree with O'Bannon that Instruction No. 9A improperly applied the eggshell plaintiff doctrine in his criminal case. The "common law tort principle commonly referred to as the 'thin skull' or 'eggshell skull' doctrine [is that] one who injures another takes the injured as she finds him." *Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 428 (Utah 1995). We determine that Instruction No. 9A was misleading because it confuses the mental state required for a second degree felony child abuse conviction. The instruction incorrectly allowed the jury to find O'Bannon guilty of second degree felony child abuse when it determined that he intentionally or knowingly shook the victim, rather than requiring the State to prove that O'Bannon intended to cause the victim serious physical injury or that O'Bannon knew that his actions were reasonably certain to cause the victim serious physical injury.

¶33   The State modeled Instruction No. 9A on *Brackett v. Peters*, 11 F.3d 78 (7th Cir. 1993), *cert. denied*, 511 U.S. 1072 (1994), in which the Seventh Circuit affirmed the murder conviction of a defendant who had raped and assaulted an eighty-five-year-old woman. *See id.* at 82. The victim's death was partially caused by the injuries she suffered during the defendant's attack. *See id.* at 79-80. The *Brackett* court concluded that it was sufficient that the injuries the defendant inflicted on the victim constituted some of the myriad causes of the victim's death and thus stated that "when injury or

death ensues from deliberate wrongdoing, even if . . . [death] is not an intended consequence, the criminal law comes down heavily on the defendant without worrying overmuch about the precise amount of harm inflicted." *Id.* at 82.

¶34   A critical distinction between *Brackett* and this case is that *Brackett* involved felony murder. *See id.* To obtain a conviction for felony murder, the prosecution was not required to prove that the defendant had the specific intent to kill, only that the defendant had the intent to engage in certain proscribed conduct that resulted in the death of another. *See id.* Thus, the intent requirement for a felony murder conviction is different than that required for second degree felony child abuse, which, as explained above, requires the State to prove intent to cause serious physical injury or that the defendant acted with knowledge of the reasonably certain consequences of his conduct. *Compare id.*, *with* Utah Code Ann. § 76-5-109(2)(a) (Supp. 2011). Contrasting felony murder with intentional murder, the Seventh Circuit explained, "[t]he eggshell-skull principle does not quite fit a case of intentional murder, for the murderer must intend his victim's death and ordinarily this will presuppose some awareness of the likely consequences of his act." *Brackett,* 11 F.3d at 81-82. The Seventh Circuit acknowledged that a tort law concept such as the eggshell plaintiff doctrine focuses on compensation for injuries "while criminal law, which emphasizes deterrence and incapacitation, focuses on the dangerousness of the defendant's conduct." *Id.* at 82. Nevertheless, the Seventh Circuit upheld the trial court's application of the tort doctrine in the felony murder criminal case. *See id.*

¶35   Instruction No. 9A incorporated the tort law concept of the eggshell plaintiff doctrine: "In criminal law the injurer takes his victim as he finds him," and "[w]hen injury ensues from deliberate wrongdoing, even if it is not an intended consequence, the injurer is responsible at law without the law concerning itself with the precise amount of harm inflicted." These statements distort the mental state requirement that must be proven to sustain a conviction for second degree felony child abuse. As we explained above, a second degree felony child abuse conviction requires a finding that the defendant intended to cause the child serious physical injury or that the defendant knew that by engaging in certain conduct, "he or she was reasonably certain to cause" the child serious physical injury. *See* Utah Code Ann. § 76-2-103(1)-(2) (2008); *id.* § 76-5-109(2)(a) (Supp. 2011). The eggshell plaintiff doctrine confuses the mental state element of second degree felony child abuse because if a person did not intend to cause serious physical injury to the child or know that his or her conduct was reasonably certain to cause serious physical injury to the child, then he or she cannot be found guilty of

intentionally or knowingly causing serious physical injury to the child, even if the child is unusually vulnerable. The State must prove that the defendant knowingly or intentionally caused a "precise amount of harm." *See Brackett*, 11 F.3d at 82. The fact that the victim may have been extra susceptible to injury does not relieve the State of its burden to prove that O'Bannon intentionally or knowingly caused the serious physical injury that the victim suffered.

¶36    The State asserts that the Utah appellate courts have applied the eggshell plaintiff doctrine in the criminal law context in *State v. Hamblin*, 676 P.2d 376 (Utah 1983), and *State v. Gonzales*, 2002 UT App 256, 56 P.3d 969. In *Hamblin*, although the supreme court did not refer to the eggshell plaintiff doctrine, it affirmed the trial court's decision not to instruct the jury that it was required to find the defendant, who had been speeding and had a blood alcohol content of .12 percent, the "'sole proximate cause'" of the death of the victim, who had been driving with a blood alcohol content of .10%, in order to find the defendant guilty of automobile homicide. *See Hamblin*, 676 P.2d at 377-79. The supreme court quoted an Alaska Supreme Court case to explain the following:

> "The state, in a criminal case, is not required to prove
> beyond a reasonable doubt that the defendant's negligence
> was the *sole* proximate cause of the death. When a
> defendant negligently creates a risk of death to another
> person, the fact that the person actually died as a result of
> the combination of that negligence plus some other
> contributing factor does not serve to exculpate."

*Id.* at 379 (emphasis in original) (quoting *Wren v. State*, 577 P.2d 235, 240 (Alaska 1978)).

¶37    In *Gonzales*, this court held that the trial court properly instructed the jury on causation in that it could correctly convict the defendant of manslaughter even if there was another significant contributing factor to the victim's death, such as the victim's intoxication. *See* 56 P.3d 969, ¶¶ 20-21 ("A defendant's acts may be found to be the proximate cause of the victim's death even if the victim 'actually died as a result of the combination of [the defendant's acts] plus some other contributing factor.'" (alteration in original) (quoting *Hamblin*, 676 P.2d at 379)).

¶38    *Gonzales* and *Hamblin* do not support the application of the eggshell plaintiff doctrine in a criminal case. We agree that *Gonzales* and *Hamblin* are instructive in that these cases recognize a basis under Utah law for holding a defendant culpable for causing death even when other factors contributed to the victim's death. *See generally Hamblin*, 676 P.2d at 379; *Gonzales*, 2002 UT App 256, ¶¶ 20-21. In this case, however, Instruction No. 9A is not comparable to those issued in *Gonzales* and *Hamblin*. Instruction No. 9A advised the jury that it could find O'Bannon guilty of a specific result-based offense without determining that he had the requisite intent or knowledge that his conduct would cause that result. Thus, Instruction No. 9A improperly allowed the jury to find O'Bannon guilty without the required proof that he intentionally or knowingly caused the victim's serious physical injuries.

¶39    Finally, after reviewing the jury instructions in their entirety, we cannot say that, "taken as a whole," they "fairly instruct[ed] the jury on the applicable law." *See State v. Malaga,* 2006 UT App 103, ¶ 18, 132 P.3d 703 (internal quotation marks omitted); *see also State v. Harper*, 2006 UT App 178, ¶ 14, 136 P.3d 1261 ("If taken as a whole [the instructions] fairly instruct the jury on the law applicable to the case, the fact that one of the instructions, standing alone, is not as accurate as it might have been is not reversible error." (internal quotation marks omitted)). We acknowledge that the jury was instructed that it was "justified in inferring that a person must have intended the natural and probable consequences of any act purposely done by him or her," and that it could infer intent from circumstantial evidence such as "a voluntary act which produces as its natural and probable consequence an unlawful result." Although these instructions are consistent with Utah law, *see, e.g.*, *State v. James*, 819 P.2d 781, 789-90 (Utah 1991) (stating that "[an] inference is made that the natural consequences of that act were intended to occur" and that "intent is of necessity proven by circumstantial evidence"); *State v. Sisneros*, 631 P.2d 856, 859 (Utah 1981) ("[A] person is presumed to intend the natural and probable consequences of his acts." (internal quotation marks omitted)); *State v. Robertson*, 2005 UT App 419, ¶ 15, 122 P.3d 895 ("[T]he intent to commit [a crime] is a state of mind, which is rarely susceptible of direct proof, it can be inferred from conduct and attendant circumstances in the light of human behavior and experience." (internal quotation marks omitted)), they do not compensate for Instruction No. 9A, which confuses the mental state element for a second degree felony child abuse conviction.

II. The Erroneous Jury Instruction Constitutes Reversible Error Because O'Bannon Was

Prejudiced by Instruction No. 9A.

¶40    O'Bannon argues, and we agree, that Instruction No. 9A improperly instructed the jury that it could find O'Bannon guilty of second degree felony child abuse without determining that O'Bannon actually intended to cause or knowingly caused the victim serious physical injury.  The prosecutor highlighted Instruction No. 9A in closing argument, stating,

> In criminal law, the injurer takes the victim as he finds him. That means that if there was [a] sub-acute hemorrhage in this [victim's] head, if he causes injury and shakes this child to cause not only the new injury, but a re-bleed of the old, he is responsible for all of the damage that may be because of the re-injury to an old injury.

In closing argument the prosecutor also stated, "All the State is required to show is that [O'Bannon] intended to do the shaking."

¶41    Instruction No. 9A, combined with the State's closing argument, instructed the jury that it could find O'Bannon guilty of second degree felony child abuse without determining that he had the requisite intent or knowledge to cause the victim serious physical injury.  Therefore, we agree with O'Bannon that the court erred by so instructing the jury.  However, an error is reversible only if the defendant persuades us that there was "a reasonable probability the error affected the outcome of his case.'" *State v. Perez*, 2002 UT App 211, ¶ 22, 52 P.3d 451.  "An error is prejudicial if it tends to mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advise[s] the jury on the law."  *State v. Penn*, 2004 UT App 212, ¶ 28, 94 P.3d 308 (alteration in original) (internal quotation marks omitted).

¶42    The State contends, even if we determine as we have, that O'Bannon could be convicted of second degree felony child abuse only if he intended to cause serious physical injury or acted knowing that his actions were reasonably certain to cause serious physical injury, the evidence presented at trial was sufficient to prove beyond a reasonable doubt that O'Bannon intentionally or knowingly caused the victim serious physical injury.  The State argues that because the jury accepted the State's theory of the victim's injuries—that they were caused by O'Bannon violently shaking the

victim—and because the jury was instructed that it was "justified in inferring that a person must have intended the natural and probable consequences of any act purposely done by him or her," and could infer intent from circumstantial evidence such as "a voluntary act which produces as its natural and probable consequence an unlawful result," we must conclude that there is no reasonable possibility that O'Bannon violently shook the victim without intending the natural and probable consequences of his actions, and therefore, that O'Bannon intended to cause the victim serious physical injury.

¶43   Proof of a culpable mental state comes by way of circumstantial evidence, and proof of intent or knowledge is an inference that may be drawn by the factfinder both from direct and from circumstantial evidence. *See James*, 819 P.2d at 789-90. A jury can infer intent or knowledge from the defendant's acts, conduct, and remarks as well as from the circumstances surrounding the alleged crime. In this case, the State sought to prove O'Bannon's mental state through circumstantial evidence. No direct evidence was presented to prove O'Bannon's intent to cause the victim's serious physical injury or to prove O'Bannon's knowledge that serious physical injury was reasonably likely to result from his conduct. While the State's witnesses testified and common sense indicates that *violent* shaking of a child provides for a substantial and unjustifiable risk of serious physical injury to that child, the fact that the victim had a prior injury and may have been especially vulnerable to further bleeding in his brain demonstrates that O'Bannon could have caused the victim serious physical injury without the requisite intent to do so. Though O'Bannon did not present evidence that he unintentionally caused the victim's serious physical injuries, (i.e., shook the victim just a little bit), the State suggested that very defense by arguing that the jury could find O'Bannon guilty of second degree felony child abuse if it found that he shook the victim only enough to cause a re-bleed of the old injury in the victim's brain.

¶44   The error in giving Instruction No. 9A was prejudicial because "'we cannot be sure' that the jury based its" determination on the State's argument that the victim did not fall down the stairs and that O'Bannon violently shook the victim, rather than on the State's closing argument that O'Bannon shook the victim only enough to cause a re-bleed of an older injury. *Cf. State v. Davis*, 2007 UT App 13, ¶ 13, 155 P.3d 909 (reversing a conviction and stating, "'we cannot be sure' that the jury based its drug-free zone determination on the public parking lot instruction and not on the erroneous bicycle path instruction" (quoting *State v. Dunn*, 850 P.2d 1201, 1209 (Utah 1993))).

¶45    Thus, the jury instructions, specifically Instruction No. 9A, did not fairly instruct the jury on the mental state requirement for second degree felony child abuse, and we determine that there is a reasonable likelihood that the trial court's error in giving Instruction No. 9A affected the outcome of the trial. *See Perez*, 2002 UT App 211, ¶ 22.


CONCLUSION

¶46    The trial court erred by giving Instruction No. 9A, which misled the jury as to the mental state required, and which improperly applied the tort concept known as the eggshell plaintiff doctrine to the child abuse statute. Because the error was prejudicial, we reverse O'Bannon's conviction and remand for a new trial.


_____
Michele M. Christiansen, Judge

-----

¶47    WE CONCUR:


_____
Gregory K. Orme, Judge


_____
Stephen L. Roth, Judge