



FILED
Mar 12 2025, 10:00 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 24S-CR-207

## Zachariah David Konkle,
*Appellant (Defendant below),*

—v—

## State of Indiana,
*Appellee (Plaintiff below).*

---

Argued: September 12, 2024 | Decided: March 12, 2025

Appeal from the Jackson Circuit Court
No. 36C01-2108-MR-1
The Honorable Richard W. Poynter, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 23A-CR-00783

---

### Opinion by Justice Massa

Chief Justice Rush and Justices Slaughter and Molter concur.
Justice Goff concurs in part and dissents in part with separate opinion.

**Massa, Justice.**

A jury found Zachariah Konkle guilty of voluntary manslaughter for knowingly killing Michael Steele. During closing arguments to the jury, the State invoked a well-known rule of tort law, the eggshell skull doctrine, to rebut assertions that Steele died from preexisting heart conditions. On appeal, Konkle argues: (1) that the State committed prosecutorial misconduct by invoking the eggshell skull doctrine in a murder case, (2) that the State lacked sufficient evidence to prove that he "knowingly" killed Steele, and (3) that his sentence is inappropriate in light of the nature of the offense and the character of the offender. Finding no prosecutorial misconduct, sufficient evidence to prove the "knowing" element of the crime, and that the sentence was appropriate, we affirm Konkle's conviction.

# Facts and Procedural History

Zachariah Konkle worked as a ride operator for Poor Jack Amusements ("Poor Jack"). Poor Jack is a traveling carnival that operates at numerous county fairs throughout Indiana. Poor Jack owns and operates rides, with ride operators or "ride jocks" working directly for Poor Jack. Poor Jack also contracts with third-party gaming companies which employ its own game operators or "gamies." In July 2021, the ride jocks and gamies were on the job at the Jackson County Fair. The gamies included two men named Michael Steele and Robert Clark.

A mother ("Mother") attended the Jackson County Fair that summer with her husband and children. Their seven-year-old daughter has several mental and behavioral issues, and after she lost a game, she began having a tantrum. A nearby gamie began mocking and making fun of Mother's daughter. Although Mother informed him that her daughter has special needs, the gamie told Mother to "get over it." After this, between 11:00 and 11:30 p.m., Mother searched for a supervisor to report the incident. Konkle, a ride jock, heard about the incident, approached Mother, and informed her that he would "take care of it."

Around 1:00 a.m., while speaking with some co-workers, Konkle stated that "somebody [had been] messing with a mentally handicapped child" and that "if he found the person that he was going to hurt them." Although multiple carnival employees told Konkle to let management handle the situation, Konkle ignored their advice. Konkle initially thought Clark responsible and attacked him first. Clark explained to Konkle that he did not make fun of anyone and that Konkle had attacked the wrong person. Konkle then began telling other employees, including Steele, that a "gamie" had made fun of a handicapped child and that if Konkle "hit the wrong person the first time the other one's going to get it twice as worse."

Steele said, "let's go." Steele threw the first punch, and the two men exchanged blows thereafter. Konkle, however, was unaware that Steele had several pre-existing heart conditions, including cardiovascular disease, significantly blocked coronary arteries, and an enlarged heart. Steele tackled Konkle to the ground, but Konkle ended up on top, with his chest pressing Steele's face "in[to] the ground." According to testimony from multiple carnival employees, it "looked like" Konkle's arms were "around [Steele's] neck." Konkle hit the back of Steele's head approximately five times and said, "[G]o to sleep bitch." Steele then began gurgling and foaming at the mouth, which carnival employees noted sounded like "[Steele] had food in his lungs" and that "he was fighting for air."

At this point, Konkle was physically separated from Steele and another carnival employee attempted to resuscitate Steele using CPR, which Konkle actually joined in. Another carnival employee called 911. Konkle asked those present at the scene to tell law enforcement that Steele had fallen while taking a shower. Konkle also said that he wanted to run away.

Police were summoned from the other side of the fairgrounds and found Steele lying on his back with his body partially under one of the bunkhouses, gasping for air and with only a faint pulse. Steele stopped breathing and officers administered CPR until paramedics arrived. Once the paramedics arrived, Steele had no pulse, prompting the paramedics to

place him on a cardiac monitor which displayed that Steele's heart was not beating. Paramedics observed abrasions on Steele's shoulder blades and blood dripping from his ear.

While paramedics were attending to Steele, Konkle tried to drive away. Konkle's employer prevented him from leaving, however, and instructed him to inform police about what had happened. Konkle then reported to officers at the scene that he was involved in the altercation with Steele.

After *Miranda* warnings, Konkle explained the circumstances leading up to the altercation and what happened during the fight with Steele. Konkle claimed that as soon as Steele began gasping for air, he rose from Steele's body and attempted CPR until Steele "came to." Konkle admitted that he had been angry prior to and during the altercation. Konkle was then arrested for strangulation.

Steele was transported to a hospital in Indianapolis, where he died. A forensic pathologist at the Marion County Coroner's Office performed Steele's autopsy. The pathologist concluded that Steele's cause of death was "[m]echanical asphyxiation complicating compression of the carotid artery through a 'choke hold.'" The autopsy further reported Steele's pre-existing heart condition.

Konkle was again interviewed at the Jackson County Jail and retold the circumstances surrounding the altercation to the interviewing officer. Particularly, he recounted the specifics of the fight, that he was angry about the situation with Mother and her child, that he took the situation into his own hands despite being told not to, and that he was angry for having become involved in an argument with the wrong person. Konkle further acknowledged that when Steele punched him, "it set him off" and that he became even angrier.

The State charged Konkle with murder and a jury trial ensued. Konkle conceded that he caused Steele's death and the State conceded that Konkle did not kill Steele **intentionally**. Therefore, the key issue was whether Konkle **knowingly** killed Steele.

The State's pathologist testified that Steele's brain was not functioning properly due to a lack of blood flow caused by "mechanical asphyxiation"—an outside compression of the body which results in the prevention of oxygen transmission to the brain. The doctor stated that the asphyxia could have been caused either from a chokehold, or from the compression of Steele's chest, which witnesses testified to at trial. There were neither internal nor external injuries to Steele's neck.

The doctor also found Steele had "bilateral conjunctival petechial hemorrhages consistent with repetitive compression of the carotid arteries," that petechiae hemorrhages have several other causes, including heart disease, and that Steele's cardiovascular system was in "poor" health. Steele's heart was enlarged and his coronary arteries were "narrowed by 90 percent," which constituted "critical stenosis" and had the potential to cause death on its own. He noted that Steele's heart presented signs of "previous heart attacks," one of which was recent, and that it was "[q]uite possible" that Steele had a heart attack during the fight with Konkle. His final conclusion was that Steele did not die from natural causes, but rather, his death was "at the hands of another." He further concluded by stating, "if just the struggle caused a heart attack [then he] would still call it a homicide."

Konkle presented testimony from a different expert pathologist who testified that Steele died of a heart attack, and that his examination did not uncover evidence of a chokehold. Specifically, he concluded:

> [B]ecause of the condition of [Steele's] heart I find that the manner of death in this is natural. It is not a homicide, he does have some minor non-disabling injuries that are present on his body, primarily bruising, on multiple locations, on his head, on his ears and within the soft tissues behind his ears. But he has nothing that would have prevented him from walking away had he not ceased activity of his heart.

However, he admitted on cross-examination that asphyxiation can be caused by compression and that the altercation with Konkle had contributed to Steele's heart attack. Konkle's expert also acknowledged that Steele could have survived had Konkle not held Steele down.

During closing arguments at trial, the State focused on Konkle's culpability, arguing that Konkle acted knowingly and that the jury should find Konkle guilty of murder. The State explained:

> Conduct which is knowingly is done if when he personally engaged in conduct, engaged in a conduct he's aware of a high probability that he is doing so. You know, if I start to push this over or wheel it around I'm aware of a high probability it's going to move. Okay. If I shoot somebody even if I don't intend them to die whatsoever, I'm aware of a high probability that people could die. . . . If I'm trying to put somebody to sleep I know I'm making him unconscious. I'm depriving them of oxygen or blood to the brain. That is serious bodily injury, I didn't make that up, that's Indiana law. So when you seriously injure somebody you are aware of a high probability they can die. Because people die of serious bodily injuries. It's actually that simple, . . .

Further, the State addressed lay witness testimony from carnival employees who witnessed the altercation, noting that Konkle "was asking people to tell a lie" and say that "[Steele] slipped in the shower or fell in the shower." The State also addressed testimony from one of the officers who saw "[Konkle] trying to leave," as well as Konkle's boss, who noted "she saw Konkle around, kind of back a little bit, was trying to not make eye contact with her, and then went to the car and tried to leave."

The State then transitioned to addressing the credibility of Konkle's expert witness and the expert's focus on what caused Steele's death, arguing that Steele "didn't coincidentally have a heart attack of all chances at the very moment [Konkle was] coming after him," and that "[Konkle's] actions started the chain of events that led to [Steele's] death." The State reasserted that Konkle's expert previously agreed that Steele's heart attack was a result of either the asphyxiation from Konkle laying on top of Steele, the compression of Steele's chest, or the chokehold. The State then argued, for the first time, that the "eggshell skull rule" applied and the following discussion occurred:

> [The State:] There's a principle of the law called the eggshell victim rule, sometimes called the eggshell plaintiff rule,

sometimes called the eggshell skull rule. A longstanding rule I mean read it literally because this – I didn't type this up. A longstanding rule of criminal law and tort, that's civil law, that a defendant takes his victim as he finds him. And this is where the phrase goes, if one throws a piece of chalk at a victim with an eggshell skull and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty even if he didn't intend to bring bodily harm. That's essentially saying if somebody picks on somebody who for one reason or another, health, age, is weak, as a perpetrator you don't get a bonus for picking on a weakling. Does that make sense? Next slide please. A defendant is liable for aggravation or exacerbation of a current injury. Somebody has a heart condition and you cause them to have a heart condition you're liable for that. Again, I'm not making this up. Indiana Supreme Court law from 10-11 years ago.

[Defense Counsel:]   Your Honor I'm going to object. May we approach.

[The Court:]   Counsel, the objection's overruled.

[The State:]   The victim may have a greater sensitivity to pain, they are no less victims. Our law in many aspects tries to protect those who are weaker. The defense wants you to believe it's the other way around. That it's Mr. Steele's fault that he's dead. No. Zachariah Konkle just happened to attack somebody and try to put to sleep somebody who had another condition.

Following this discussion, Konkle sought neither an admonishment nor a mistrial. Konkle argued he did not knowingly kill Steele and asked the jury to find him guilty of either reckless homicide or involuntary manslaughter.

After the closing of evidence, the jury was instructed on murder, voluntary manslaughter, reckless homicide, and involuntary manslaughter. The jury was also instructed on the definition of "knowingly":

A person engages in conduct "knowingly" if, when he engages in this conduct, he is aware of a high probability that

he is doing so. If a person is charged with knowingly causing
a result by his conduct, the State is required to prove beyond
a reasonable doubt that he must have been aware of a high
probability that his conduct would cause the result.

No additional jury instructions were provided on the eggshell skull
doctrine.

The jury found Konkle guilty of voluntary manslaughter, a knowing
killing mitigated by sudden heat. The court sentenced Konkle to twenty-
four years, with a ten-year habitual offender enhancement, for a total of
thirty-four years.

Konkle appealed, arguing the State's invocation of the eggshell skull
doctrine during closing argument constituted prosecutorial misconduct
and that the eggshell skull doctrine does not apply to murder and
voluntary manslaughter cases. Konkle also argued the State lacked
sufficient evidence to convict him of a knowing killing. Finally, Konkle
argued that his sentence was inappropriate in light of the nature of the
offense and his character. The Court of Appeals reversed and remanded
for a new trial. *Konkle v. State*, 227 N.E.3d 212 (Ind. Ct. App. 2024). The
court held that Konkle waived his prosecutorial misconduct argument,
stating that to preserve an issue about a closing argument on appeal, a
party must: (1) timely object to that portion of the closing argument at
issue; (2) request the trial court to admonish the jury—even if the trial
court overruled the timely objection; and (3) move for a mistrial if
requesting additional relief. *Id.* at 217–18. Despite this, the court still found
that the State's conduct during closing argument constituted fundamental
error and held that the State's application of the eggshell skull doctrine
was a misstatement of law that "placed Konkle in a position of grave peril
and made a fair trial impossible." *Id.* at 219. The court also noted there was
sufficient evidence to support Konkle's conviction. *Id.* at 220 n.8. The
court, however, did not address the appropriateness of Konkle's sentence.

The State petitioned for transfer, which we granted, thereby vacating
the Court of Appeals' decision. Ind. Appellate Rule 58(A); *see Konkle v.
State*, 238 N.E.3d 635 (Ind. 2024).

# Discussion and Decision

# I. Prosecutorial Misconduct.

When reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine "(1) whether misconduct occurred, and if so, (2) 'whether the misconduct, under all the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected' otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by *the probable persuasive effect* of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct." *Id.* (emphasis in original) (quoting *Cooper*, 854 N.E.2d at 835). To preserve the misconduct claim for appeal, the defendant must object at the time the alleged misconduct occurs. *Wright v. State*, 690 N.E.2d 1098, 1111 (Ind. 1997).

Before proceeding to the merits of Konkle's prosecutorial misconduct claim, we must first determine whether Konkle waived or preserved the prosecutorial misconduct claim for appellate review. This requires exploring the history and development of our preservation rule when objections occur during arguments to the jury.

## A. Appellate Preservation of Prosecutorial Misconduct

Our preservation requirement dates to the late 1800s in *Coleman v. State*, which involved a claim for prosecutorial misconduct during opening statements. 13 N.E. 100 (Ind. 1887). The defendant promptly objected to a line in the prosecutor's opening statement referencing the defendant's decision on whether to testify. *Id.* at 101. The trial court sustained the objection, and the prosecutor withdrew the statement. *Id.* The defendant was found guilty, and on appeal, argued that the prosecutor's statement required a new trial. *Id.* This Court, however, rejected this argument and instead chose to apply the holding in *Henning*

*v. State*, 6 N.E. 803, 809 (Ind. 1886), which provided that a failure to object or seek recourse for juror misconduct constituted waiver. The Court concluded the following:

> To have made available error, the trial court should have been afforded an opportunity to eliminate the error by ruling upon a motion to arrest the further progress of the case. True there was an objection and an exception to the statement of the prosecutor, but the court *sustained the objection*, and under its ruling the objectionable statement was withdrawn. There was therefore no ruling or decision of the court to which exception was or could have been saved. Our conclusion, therefore, is that, in the absence of a motion by a defendant to set aside the submission and discharge the jury, there was no available error in refusing the motion for a new trial on account of the alleged misconduct of the prosecuting attorney in making his opening statement.

*Coleman*, 13 N.E. at 102 (emphasis added) (internal citation omitted). The Court found this rule was acceptable, because finding otherwise would permit a defendant to "avail[] himself of every opportunity to secure a favorable result after becoming fully aware of such misconduct, and yet hold in reserve an absolute right to have the verdict set aside in case it did not suit him." *Id.*

This Court next addressed preservation of prosecutorial misconduct in *Grubb v. State*, 20 N.E. 257 (Ind. 1889). *Grubb* involved prejudicial statements made by the prosecutor to the jury during closing arguments. *Id.* at 260. Like in *Coleman*, the defendant promptly objected to the statements and the trial court instructed the jury to disregard them. *Id.* And similarly, there the Court concluded that all error on account of the misconduct was waived. *Id.* In relying on both *Coleman* and *Henning*, the Court provided further definition as to when the preservation requirement would apply, stating:

> Where counsel is guilty of misconduct, and the opposing party, at the time, objects, and the court, upon being asked to do so, neglects or refuses to take action in this matter, or to repair the injury to the satisfaction of the injured party, he can except, and bring the question to this court. *But in such cases,*

> *if the court does all in its power to relieve the party injured from the consequences of such misconduct, there is no action of the court to which an exception can be taken, and consequently nothing to be reviewed in this court.* In such cases, if the injured party thinks that the injury is of such a character that it cannot be repaired by any action of the court, *he should move to set aside the jury, or take such other steps as he may think will secure to him a fair and impartial trial*. If he fails to do this, and permits the case to proceed to final determination, he must be deemed to have waived all questions arising out of such misconduct.

*Id.* (emphasis added) (citing *Coleman*, 13 N.E. at 100; *Henning*, 7 N.E. at 4). Although it was not entirely clear, it appeared that the Court in *Grubb* provided a distinction between the steps to be taken when the trial court overrules an objection and those required when the trial court sustains an objection. *See Staser v. Hogan*, 21 N.E. 911, 916 (Ind. 1889) ("[I]n order to save any question in relation to the misconduct of counsel during the progress of the trial, the court must be called upon to correct the injury done. If the court refuses to do so, the party injured may except, and thus save the question involved for the consideration of this court.").

However, the first time this Court directly applied the preservation requirement to instances where a trial court overruled an objection was in *Dorsey v. State*, 100 N.E. 369 (Ind. 1913). In *Dorsey*, the prosecutor made prejudicial statements to the jury, to which the defendant objected and moved for the statements to be stricken. *Id.* at 371. Like the matter before us now, the trial court overruled the objection and declined to take any action. *Id.* Moreover, the defendant did not make any additional requests, such as moving to discharge the jury or to set aside the statement from the jury's consideration. *Id.* Although the Court found the statements were prejudicial and that it was error for the trial court to decline to interfere, the Court nonetheless found that "such error will not justify a reversal of the judgment, where, as here, no motion was made to discharge the jury." *Id.* The Court provided no authority for this conclusion, nor did it elaborate on its reasoning for applying the rule to situations involving an overruled, rather than sustained, objection. *Id.*

Our courts thereafter began applying the preservation rule to situations where a trial court overruled a timely objection. For example, in *Scanlon v. State*, the Court of Appeals recognized that the defendant complied with the preservation requirement where the defendant (1) objected to prejudicial statements made by the prosecutor, (2) moved to have the statements withdrawn from the jury, (3) moved to discharge the jury, and (4) moved for a new trial, each of which the trial court overruled or denied. 165 N.E. 562, 562 (Ind. Ct. App. 1929) (in banc). In recognizing the defendant's compliance, the Court of Appeals reversed and granted the defendant's request for a new trial. *Id.* However, like *Dorsey*, the *Scanlon* court did not explain its reasoning in applying the rule where there is an overruled objection. The court instead cited *Coleman* and *Blume v. State*, 56 N.E. 771 (Ind. 1900), cases that dealt with applying the rule to sustained objections.

However, in *Dresser v. State*, this Court finally provided some additional explanation as to why the preservation rule should be applied to cases where an objection is overruled. 454 N.E.2d 406 (Ind. 1983). In *Dresser*, the Court held that the defendant waived review of his prosecutorial misconduct claim because he "merely interposed an objection and stated why he believed them to be improper. He did not move for a mistrial or even ask that the jury be admonished to disregard them." *Id.* at 407. In explaining its decision, the Court stated the following:

> We acknowledge that the court overruled the objections that were made, which strongly indicates that such motions addressed to the objections would also have been overruled. Nevertheless, the objections made and rulings thereon preserved nothing for appellate review. Objecting to counsel's argument is like objecting to a question that has been asked and answered. If the question is believed to have been improper, a motion to strike the answer and to admonish the jury must be interposed, if the right of review is to be preserved.

*Id.*

Following *Dresser*, this Court has applied the rule consistently without discrimination as to whether the trial court overruled or sustained a

timely objection. *See, e.g.*, *Wright*, 690 N.E.2d at 1111 ("To preserve an issue regarding the propriety of a closing argument for appeal, a defendant must do more than simply make a prompt objection to the argument. Defendant must also request an admonishment, and if further relief is desired, defendant must move for a mistrial."); *Phillips v. State*, 719 N.E.2d 809, 811 (Ind. 1999) ("A defendant must do more than simply object promptly to alleged errors in closing argument."); *Flowers v. State*, 738 N.E.2d 1051, 1058–59 (Ind. 2000) ("Here, although Flowers objected to the prosecutor's remarks at trial, he failed to request an admonition. This issue is waived."); *Dumas v. State*, 803 N.E.2d 1113, 1117 (Ind. 2004) (finding that although defendant promptly objected, they waived their prosecutorial misconduct for failing to seek admonishment or mistrial); *Ryan*, 9 N.E.3d at 667 ("To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial.").

Likewise, our Court of Appeals has, for the most part, done the same. *See, e.g.*, *Tyson v. State*, 619 N.E.2d 276, 292 n.18 (Ind. Ct. App. 1993) ("Tyson failed to properly preserve this issue because he failed to ask for an admonition and mistrial. . . . Failure to request an admonishment or move for a mistrial results in waiver of the issue of improper argument."); *Evans v. State*, 855 N.E.2d 378, 384 (Ind. Ct. App. 2006) ("Even assuming that the issue was properly framed in terms of prosecutorial misconduct, Evans failed to request an admonishment or move for mistrial. He has therefore waived this issue."); *Craft v. State*, 187 N.E.3d 340, 347 (Ind. Ct. App. 2022) (finding that the defendant did preserve their claim for prosecutorial misconduct where they promptly objected and immediately requested a mistrial).

The only outlier to this line of cases is *Williams v. State*, 29 N.E.3d 144 (Ind. Ct. App. 2015), *vacated*. In *Williams*, the prosecutor made prejudicial statements during closing argument, prompting the defendant to timely object. *Id.* at 150. The trial court overruled the objection, but the defendant did not request a jury admonishment or mistrial. *Id.* On appeal, the State argued the defendant waived his claim for prosecutorial misconduct by

not seeking additional relief beyond the objection. *Id.* The Court of Appeals, however, held that the defendant preserved the issue for appeal:

> We cannot agree. Williams *did object* to the prosecutor's statement during closing argument, and the trial court *overruled* the objection. It makes absolutely no sense for the State to say a defendant must request an admonishment and a mistrial after having been told by the trial court that no misconduct occurred. Statements in *Delarose* and *Ryan* that requests for an admonishment and a mistrial are necessary to preserve a claim of prosecutorial misconduct *presuppose* that an objection is sustained and the trial court would actually have entertained a request for an admonishment. Put simply, [defendant's] overruled objection is sufficient to preserve his prosecutorial misconduct claim.

*Id.* at 150–51 (emphasis in original).

While the Court of Appeals' decision in *Williams* was later vacated by this Court, *see Williams v. State*, 34 N.E.3d 684 (Ind. 2015), we ultimately decided the case on other grounds and did not address the Court of Appeals' preservation discussion. *See Williams v. State*, 43 N.E.3d 578, 579 (Ind. 2015).

However, we are presented with the same question regarding waiver that we originally left unanswered in *Williams*—whether a failure to seek an admonishment or mistrial should result in waiver despite a timely objection being overruled. Our review of the preservation rule and its underlying purpose leads us to agree with the *Williams* Court of Appeals' reasoning that waiver should *not* be the result in such an instance.

The original purpose behind the appellate preservation requirement was two-fold: (1) it prevented counsel who were aware of misconduct from proceeding through trial without seeking relief, and then using the misconduct to set aside a verdict if the outcome was not favorable to them; and (2) it presented the trial court with an opportunity to address any grievances concerning the misconduct, for which a failure to act would open the door to appellate review. *See Coleman*, 13 N.E. at 102. As to the former, the initial objection satisfies this purpose. As to the latter, a

trial court satisfies its duty to address any perceived error when it sustains an objection. At this point, the trial court has done all that was asked of it. If a defendant fails to seek any further relief as needed, then there is nothing left for the appellate court to review on appeal. But where a trial court overrules an objection—thereby implicitly approving of any perceived errors—now the court has been presented an opportunity to act which it has neglected or failed to take up. *See Grubb*, 20 N.E. at 260.

Although cases like *Dresser* suggest that the preservation rule is intended to apply where a trial court overrules an objection, it appears these cases may have looked past the rule's purpose. Requiring additional requests where the trial court already overruled an objection appears in actuality to be futile, as it only seems logical that those requests would be denied as well. Both the Court in *Dresser* and the Court of Appeals in *Williams* even noted as much. Moreover, necessitating additional requests beyond the overruled objection simply puts an unnecessary burden on both counsel and the courts to engage in excessive motion practice.

Finally, a survey of other states' rulings on the matter further illustrates that under our previous implementation of the preservation standard, Indiana slowly developed into a residual outlier. *See, e.g., Holton v. State*, 573 So.2d 284, 288 (Fla. 1990) (emphasis in original) ("[T]his Court held that for an objection to a prosecutor's comment to be preserved for appeal, the objection must be followed by a motion for mistrial. However, we believe this rule to be purposeless where, as here, the objection is *overruled*. The objection itself calls the court's attention to the error alleged to have prejudiced the party making the objection and to the possibility that a mistrial may be in order."); *Logan v. State*, 773 S.W.2d 413, 415 (Ark. 1989) ("The State counters by arguing that the remedy was waived since the appellant did not move for a mistrial, the proper remedy for a comment on an accused's failure to testify. The argument would have merit if the trial judge had sustained the objection, meaning that he recognized the statement was [impermissible]. However, he overruled the objection which meant he ruled that it was not an impermissible comment. To require the appellant to move for a mistrial after the court had already overruled the objection would be to require a vain and useless act, and the law does not require vain and useless acts."); *see also*

*Dunn v. State*, 166 So.2d 878, 883 (Ala. 1964); *State v. Mead*, 544 A.2d 1146, 1150 (R.I. 1988); *City of Columbia v. Myers*, 294 S.E.2d 787, 788 (S.C. 1982); *Critcher v. Rudy Fick, Inc.*, 315 S.W.2d 421, 429 (Mo. 1958); *Atl. Coast Line R. Co. v. McDonald*, 119 S.E.2d 356, 364 (Ga. Ct. App. 1961); *State v. Lundbom*, 773 P.2d 11, 13 (Or. Ct. App. 1989); *Hairston v. State*, 511 A.2d 73, 77 (Md. Ct. App. 1986).

Therefore, moving forward, where a defendant timely objects to alleged misconduct by the prosecutor and the trial court *overrules* the objection, nothing further is required to preserve the issue for appeal.[1] However, while our decision here simplifies the requirements regarding overruled objections, we continue to hold that where a defendant objects and the trial court *sustains* the objection, our appellate preservation standard shall remain. That is to say, to preserve the issue for appeal following a *sustained* objection, the defendant must request an admonishment of the jury, and if further relief is required, move for a mistrial. Upon reexamination of our courts' application of the rule, the rule has been consistently applied to sustained objections in light of the rule's original purpose. For that reason, we see no need to change it in that context.

Having provided that clarification, we may now turn to the facts of this case to address whether Konkle properly preserved his claim for appeal.

During closing argument, the State argued for the first time that the eggshell skull doctrine applied in Konkle's case. Once the State explained the rule, Konkle promptly objected with "Your Honor I'm going to object. May we approach." The trial court immediately overruled Konkle's objection and no further requests were made. Given that Konkle made a timely objection to the prosecutor's statement, which was subsequently overruled, we find that he did all that was required of him. Therefore, Konkle did not waive his claim for prosecutorial misconduct on appeal.

---

[1] In other words, we will not require counsel to moreover "strenuously object" as famously posited by defense counsel in "A Few Good Men." A FEW GOOD MEN (Castle Rock Ent. 1992).

## B. Konkle's Prosecutorial Misconduct Claim

Turning to the merits of his claim, Konkle argues that the State misstated the law, and thus committed misconduct, by arguing that the eggshell skull doctrine applies to murder and voluntary manslaughter cases. However, we disagree and find that the State's explanation was not a misapplication of the law and that no misconduct occurred.

We begin by noting our basic understanding is that "[a] prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct." *Ryan*, 9 N.E.3d at 667. While our courts have held that a misstatement of law during closing argument could constitute misconduct, it is also well established that "any misstatement of law during closing argument is presumably cured by the trial court's final jury instructions." *Pritcher v. State*, 208 N.E.3d 656, 664–65 (Ind. Ct. App. 2023) (citing *Hudgins v. State*, 451 N.E.2d 1087, 1091 (Ind. 1983)). Moreover, "closing arguments are rightly received by the jury as partisan advocacy, not impartial statements of the law, and thus are likely to have little effect on the jury's understanding of the law." *Castillo v. State*, 974 N.E.2d 458, 469 n.11 (Ind. 2012); *accord Ryan*, 9 N.E.3d at 673.

Here, again, the alleged misstatement of law concerns the following comments made during the State's closing argument:

> There's a principle of the law called the eggshell victim rule, sometimes called the eggshell plaintiff rule, sometimes called the eggshell skull rule. A longstanding rule I mean read it literally because this – I didn't make this up. A longstanding rule of criminal law and tort, that's civil law, that a defendant takes his victim as he finds him. And this is where the phrase goes, if one throws a piece of chalk at a victim with an eggshell skull and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty even if he didn't intend to bring bodily harm. That's essentially saying if somebody picks on somebody who for one reason or another, health, age, is weak, as a perpetrator you don't get a bonus for picking on a weakling. Does that make sense? Next slide please. A defendant is liable for aggravation or exacerbation of a current injury. Somebody has a heart condition and you

cause them to have a heart condition you're liable for that. Again, I'm not making this up. Indiana Supreme Court law from 10-11 years ago.

In order to determine whether prosecutorial misconduct took place, we first need to examine what the eggshell skull doctrine is and whether it applies to murder or voluntary manslaughter. Originally coined as the "thin skull" rule and developed around the turn of the twentieth century, *see Vosburg v. Putney*, 50 N.W. 403, 403–04 (Wis. 1891); *Spade v. Lynn & B.R.R.*, 52 N.E. 747, 748 (Mass. 1899), the eggshell skull doctrine is a well-recognized and seminal rule of causation within the realm of criminal[2] and tort law. The doctrine stands for the principle that a defendant "takes his victim as he finds him," *Renner v. Shepard-Bazant*, 172 N.E.3d 1208, 1217 (Ind. 2021) (quoting *Bailey v. State*, 979 N.E.2d 133, 142 (Ind. 2012)), and is therefore "liable to the extent that their conduct aggravates a pre-existing condition but is not liable for damages stemming from a pre-existing injury that independently causes harm." *Id.* (citing *Dunn v. Cadiente*, 516 N.E.2d 52, 56 (Ind. 1987)).

And importantly, it is also well known within our criminal law that the State is required to prove **both** causation and *mens rea* to satisfy the burden of proof for a given crime. Put differently, "to support a conviction the State must prove that the defendant not only committed the acts constituting the crime but that he intended to do so." *Metzler v. State*, 540 N.E.2d 606, 609 (Ind. 1989). This in essence necessitates a demonstration of causation as to the actus reus (the physical act), in addition to proof of the defendant's *mens rea* (the culpable mind). *See Hampton v. State*, 961 N.E.2d 480, 487 n.5 (Ind. 2012) ("The Latin phrase 'actus reus' refers to the 'wrongful deed that comprises the physical components of a crime and

---

[2] As the United States Supreme Court has noted within the criminal context, "[t]he law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause." *Burrage v. U.S.*, 571 U.S. 204, 210 (2014) (citing H. Hart & A. Honore, Causation in the Law 104 (1959)). "When a crime requires 'not merely conduct but also a specified result of conduct,' a defendant generally may not be convicted unless his conduct is 'both (1) the actual cause, and (2) the "legal" cause (often called the "proximate cause") of the result.'" *Id.* (quoting 1 W. LaFave, Substantive Criminal Law § 6.4(a), pp. 464–66 (2d ed. 2003); citing ALI, Model Penal Code § 2.03, p. 25 (1985)).

that generally must be coupled with the *mens rea* [the criminal state of mind], to establish criminal liability.'").

In invoking the eggshell skull doctrine, the State referred to this Court's prior decision in *Bailey v. State* where we addressed the doctrine in the context of our criminal battery statutes. In *Bailey*, we wrestled with the question of whether pain alone was sufficient evidence to prove the "bodily injury" element in a domestic battery conviction. 979 N.E.2d at 133. There, the defendant repeatedly shoved and poked his wife with enough force to push her head back, causing her pain. *Id.* at 134. The defendant was charged with and convicted of domestic battery, which was enhanced from a class B misdemeanor to a class A misdemeanor due to "bodily injury." *Id.* On appeal, the defendant argued the evidence was insufficient to support the bodily injury enhancement. *See* Ind. Code § 35-31.5-2-29 (defining "bodily injury" as "any impairment of physical condition, including physical pain"). We in turn considered whether any level of pain suffices to establish bodily injury or if instead a threshold level must be met. *Bailey*, 979 N.E.2d at 136. In concluding it was the former, we found that a bright-line test was preferrable because to hold otherwise could "unfairly discount the suffering of certain victims who may have a lower pain tolerance than others, which runs counter to the long-standing rule of both criminal and tort law that a defendant takes his victims as he finds him." *Id.* at 142 (citing *Defries v. State*, 342 N.E.2d 622, 630 (Ind. 1976)). We further noted that "[t]hough they may have a greater sensitivity to pain, these individuals are no less victims than someone who may be more tolerant." *Id.*

The *Bailey* Court's reliance on *Defries v. State* turned on the fact that *Defries* involved aggravated battery. In explaining the aggravated battery statute in effect there, which required proof of "great bodily harm," we indicated that a defendant need not intend to inflict great bodily harm to be convicted under the statute. *Defries*, 342 N.E.2d at 630. In so doing, we recited that "if one throws a piece of chalk at the legendary victim with an eggshell skull, and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty under our statute even though he did not intend to do great bodily harm." *Id.*

In both *Bailey* and *Defries*, our analysis did not center around whether the defendant *intended to cause* the charged harm. Rather, our interest was whether the defendant *caused* the requisite level of harm. Thus, the consideration of the eggshell skull doctrine in *Bailey* and *Defries* demonstrated that, at least under our battery statutes, the rule was applicable to proving **causation** and not **mens rea**. *See, e.g., Lowden v. State*, 51 N.E.3d 1220 (Ind. Ct. App. 2016) (holding that in a prosecution for aggravated battery, the State need not prove a defendant knew he would cause serious bodily injury because the severity of the injury is not an element of the crime).

But unlike with battery, the eggshell skull doctrine has not been applied to murder or its kindred in this state. To the extent that other courts have considered the doctrine in murder or voluntary manslaughter cases, there is some guidance to consult.

Take for example the Seventh Circuit's decision in *Brackett v. Peters*, 11 F.3d 78, 81–82 (7th Cir. 1993), *cert. denied*, 511 U.S. 1072 (1994), where the court, in upholding the defendant's conviction, considered the eggshell skull doctrine in the context of felony murder. There, the defendant raped and beat an eighty-five-year-old woman, putting her into a hospital, and later a nursing home, for several weeks with severe injuries. *Id.* at 79. The woman—previously described as active and healthy prior to her rape and assault—developed a state of depression in which she refused to eat and became progressively weaker. *Id.* Attempts to feed her through a tube were met with difficulty due to the facial injuries inflicted by the defendant, forcing nursing staff to try feeding her pureed food through a feeder syringe. *Id.* The woman died, and a subsequent autopsy revealed that several ounces of food had become lodged in her trachea, asphyxiating her. *Id.*

The defendant was convicted of felony murder and given a lengthy prison sentence. *Id.* The defendant then sought federal habeas corpus review, arguing that no rational finder of fact could have found that it was he who caused the woman's death. *Id.* The district court denied the application, and on appeal the Seventh Circuit concluded that the

defendant's actions did cause the woman's death, applying the eggshell skull doctrine to explain its reasoning. *Id.*

First, the court defined that "an act is a cause of an event if two conditions are satisfied: the event would not have occurred without the act; the act made the event more likely." *Id.* The court rationalized that "[t]he first condition is necessary to distinguish the attempted from the completed crime, the second to rule out cases in which . . . the act did not create the kind of dangerous condition that would make such events more likely to occur." *Id.* The court noted, however, that "[e]ven with this qualification . . . every event has multiple causes." *Id.* From here, the court explained that in addition to the injuries sustained by the defendant's assault, the woman's autopsy revealed signs of senility, a common cause of depression, appetite loss, and weakness—all non-fortuitous conditions that not only made her death from the defendant's assault more likely but were of the nature that her death would not have occurred in the first place had one been absent. *Id.* at 80. Furthermore, the court pointed out that the immediate cause of the woman's death was the conduct of the nurse in depositing food into her trachea. *Id.* Yet despite demonstrating that the woman's death was likely the consequence of multiple causes, the court reasoned that

> [A] murderer does not avoid conviction by pointing out that his act was only one of many causes that concurred to bring about his victim's death. It is enough if his act was one of the causes—enough therefore if Brackett's assault made Mrs. Winslow's death more likely and if, but for the assault, she would not have died as soon as she did.

*Id.*

In reaching the conclusion that the conditions of causation were satisfied, the court detailed that the risk of death from beating and raping an eighty-five-year-old woman was abundantly clear, and that despite there being multiple causes the defendant's actions were of such a nature as to have precipitated the woman's rapid decline in health. *Id.* This was evident from the record, in which the woman's description as active and healthy indicated that her senility could not have been so advanced as to

lead to imminent death. *Id.* Further, the proximity in time between the act and the death, as well as the nature of the result produced, indicated that no alternative causal sequence was present—that it was highly unlikely that had she *not* been assaulted she still would have entered the hospital the next day and died a month later. *Id.* "Death was the last link in a continuous series of events that began with the assault." *Id.*

Interestingly, the court followed up this discussion by contrasting felony murder with intentional murder,[3] where it found "[t]he eggshell-skull principle does not quite fit a case of intentional murder, for the murderer must intend his victim's death and ordinarily this will presuppose some awareness of the likely consequences of his act." *Id.* at 81–82. In making this distinction, the court explained that the primary consideration for felony murder is "that the death must be *caused* by the felony; for remember that 'cause' in law means not just but-for cause but also an enhancement of the likelihood . . . that the class of events would occur." *Id.* at 82 (emphasis added) (citing O.W. Holmes, Jr., *The Common Law* 58 (1881)); *see also State v. Stendrup*, 983 N.W.2d 231, 242 (Iowa 2022) (applying the eggshell skull doctrine to causation component of felony murder).

And while the Utah Court of Appeals did not consider the eggshell skull doctrine under the scope of murder, another example of the doctrine's application and reasoning can be found in *State v. O'Bannon*, 274 P.3d 992 (Utah Ct. App. 2012), in which the court relied on *Brackett* to consider the extent of the doctrine's applicability to second-degree felony child abuse. There, it was alleged that the defendant violently shook a child, causing the child to later fall down the stairs. *Id.* at 997. The child was found to have sustained severe internal injuries, including retinal hemorrhages and retinoschisis. *Id.* at 996. At trial, the defendant

---

[3] The Seventh Circuit in *Brackett* considered murder under Illinois law. Illinois' murder statute provides that a person commits first degree murder if:

> (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or (3) he is attempting or committing a forcible felony other than [involuntary manslaughter].

Ill. Rev. Stat. ch. 38, ¶ 9-1(a)(1)–(3) (1981).

introduced a "re-bleed" defense, arguing that the child's internal injuries were not the defendant's doing, but rather, a result of the child's prior sub-dural hematoma, which was likely exacerbated by the child's fall. *Id.* To combat this defense, the State proposed, and the trial court gave, a jury instruction stating, "[i]n criminal law the injurer takes his victim as he finds him. When injury ensues from deliberate wrongdoing, even if it is not an intended consequence, the injurer is responsible at law without the law concerning itself with the precise amount of harm inflicted." *Id.* at 997. The defendant was ultimately found guilty of second-degree felony child abuse and appealed only the jury instruction. *Id.*

The Utah appellate court reversed the defendant's conviction and remanded for a new trial. *Id.* at 1004. The court found that the State's use of the eggshell skull doctrine was misleading because it confused the requisite mental state, explaining that if a person did not intend to cause a child serious physical injury or know that their conduct was reasonably certain to cause serious physical injury, "then he or she cannot be found guilty of intentionally or knowingly causing serious physical injury to the child, even if the child is unusually vulnerable." *Id.* at 1002. Noting that the State modeled the jury instruction on *Brackett*, the court distinguished *Brackett* on the basis that second-degree felony child abuse, unlike felony murder, requires the State to prove a *specific intent* element. *Id.* at 1001; *see* Utah Code Ann. §§ 76-2-103(1)–(2), 76-5-109(2)(a) (Supp. 2011) (providing that a second-degree felony child abuse conviction requires a finding that the defendant intended to cause the child serious physical injury or that the defendant knew that by engaging in certain conduct, "he or she was reasonably certain to cause" the child serious physical injury). The court then reiterated *Brackett*'s underlying analysis, explaining that the doctrine was applied in *Brackett* for proving causation and not intent. *O'Bannon*, 274 P.3d at 1002. In reaching the conclusion that the doctrine is not to be invoked for proving intent, the court emphasized that "[t]he State must prove that the defendant knowingly or intentionally causes a precise amount of harm" and that "[t]he fact that the victim may have been extra susceptible to injury does not relieve the State of its burden to prove that O'Bannon intentionally or knowingly caused the serious physical injury

that the victim suffered." *Id.* (internal citation and quotation marks omitted).

These cases help us determine that the eggshell skull doctrine can be applied both inside and outside the context of murder. Moreover, as the eggshell skull doctrine is one of causation, and causation is a required element in proving a criminal conviction, it only makes sense that the doctrine be applied for such purposes. This concept is clearly demonstrated in each of the cases discussed thus far. But as *O'Bannon* and *Brackett* further illustrate, the doctrine should **not** be construed to alleviate the State's burden to prove any requisite intent elements. In fact, the doctrine should not be invoked for proving *mens rea*, period. The Seventh Circuit explicitly recognized this limiting principle. In intentional murder cases specifically, a victim's preexisting ailment will be of no concern where a murderer's intentional actions will result in the victim's death regardless of whether a preexisting condition exists. *See Brackett*, 11 F.3d at 82. Therefore, because the eggshell skull doctrine has traditionally dwelled within an analysis of causation—whether in tort or criminal law—our ruling today clarifies that this is where it should dwell hereafter.

Having made that clarification, we are left to apply the doctrine to the case before us: knowing murder and voluntary manslaughter. To start, a knowing murder or voluntary manslaughter requires the State to prove both that there was a killing and that the killing was done "knowingly." *See* Ind. Code § 35-41-2-2(b) (providing that a person "knowingly" commits murder or manslaughter when they are aware of a high probability that their actions may kill). As to the killing, we see no reason why the eggshell skull doctrine could not apply to prove that the defendant was *a cause* of the victim's death. This is particularly true for cases such as this where a victim's preexisting conditions may be of great relevance. But importantly we note that as in *O'Bannon*, "[t]he fact that the victim may have been extra susceptible to injury does not relieve the State of its burden" to prove a defendant's *mens rea* or intent. *O'Bannon*, 274 P.3d at 1002. Therefore, we caution parties who invoke the eggshell skull doctrine for murder and voluntary manslaughter cases to understand when and where the doctrine applies. To do otherwise is to do so at their own peril. As we clarified above, the doctrine has no place for proving the

requisite mental state, and as such should not be construed as alleviating that burden. Should the doctrine be raised, it is strongly recommended that the doctrine be accompanied by a jury instruction adequately explaining the doctrine's scope and applicability.

The dissent argues that our application of the eggshell skull doctrine to murder cases, or particularly, "homicide cases requiring proof of a knowing or intentional *mens rea*," is an unnecessary expansion. *Post*, at 1–2. This reading of our decision, however, mischaracterizes the doctrine's application in a few crucial ways.

First, respectfully, the murder charge at issue here—knowing murder—is *not* a specific intent crime. This Court has directly addressed this distinction in comparing murder (knowing and intentional) to attempted murder. *See Garrett v. State*, 714 N.E.2d 618, 622 (Ind. 1999) ("As this Court recently held in *Williams v. State*, 700 N.E.2d 784 (Ind. 1998), the requirement of a 'specific intent to kill' applies only in attempted murder cases, and not in murder cases where 'the defendant may be convicted upon a showing of *either* an intentional or knowing killing.'") (emphasis in original); *see also Echols v. State*, 722 N.E.2d 805, 807–08 (Ind. 2000) ("Echols correctly recites the law regarding the necessity of a jury instruction on specific intent in an attempted murder case. . . . There is no comparable requirement for the murder charge."). And although the dissent remarks that our reliance on *O'Bannon*—where the Utah Court of Appeals found the doctrine was inappropriately directed to the specific intent *mens rea* of the child abuse charge at issue—is to our own detriment, *see Post*, at 2–3, it is exactly the fact that this case does not involve a specific intent element that bolsters its applicability here.

Second, the dissent overlooks the fact that the State *must* prove causation to satisfy a conviction for murder. *See Metzler*, 540 N.E.2d at 609; *Hampton*, 961 N.E.2d at 487 n.5; *see also* I.C. § 35-42-1-1(a)(1) (providing that to convict one of murder, the State must prove a person **killed** another human being). Because the eggshell skull doctrine is clearly one of causation, it only logically follows that it would serve a purpose in satisfying the State's burden under that requirement. The dissent does not appear to take issue with this, but instead, attempts to narrow the *type of*

*murder* to which the doctrine may apply by reading *Brackett* as only including felony murder. *See Post*, at 2 and n.2. While felony murder was the particular type of murder charged in *Brackett*, the central focus there was on causation broadly. The Seventh Circuit did not single out felony murder or state that the doctrine is narrowly applicable. Rather, as *Brackett* and *O'Bannon* both indicated, the only types of murder explicitly not covered by the doctrine are those classified as intentional and specific intent (e.g., attempted murder). Neither are at issue here.

Given our conclusion that the eggshell skull doctrine is applicable to the charges at issue here, we find that the prosecutor, in invoking the doctrine, did not misstate the law.

The record reflects that the doctrine was not invoked to discuss whether Konkle was aware of Steele's heart conditions, and thus whether Konkle was aware of a high probability that his conduct would result in Steele's death. Rather, the doctrine was raised to combat Konkle's argument that Steele's death was purely a result of his coronary artery disease. Particularly, the testimony of Konkle's expert pathologist, for one reason or another, was directed to *the cause* of Konkle's death, concluding that the combination of Steele's heart conditions resulted in a heart attack that ultimately took Steele's life. In the State's closing argument, the prosecutor rebutted this assertion with an argument that Konkle's conduct was a but-for cause of Steele's ultimate death. The State even reiterated that Konkle was a cause of Steele's death following its invocation of the doctrine:

> The victim may have a greater sensitivity to pain, they are no less victims. Our law in many aspects tries to protect those who are weaker. **The defense wants you to believe it's the other way around. That it's Mr. Steele's fault that he's dead. No. Zachariah Konkle just happened to attack somebody and try to put to sleep somebody who had another condition.**

The dissent again mistakes the State's invocation of the doctrine as erroneously going to *mens rea*, claiming that "had [we] focused [our] analysis on the actual remarks by the State that prompted the objection,

[we] should have concluded—based on the very precedent [we] relie[d] on—that the State's arguments in closing amounted to a misstatement of the law." *Post*, at 4. Specifically, the dissent focuses on one line of the State's argument, where it argued that "if one throws a piece of chalk at a victim with an eggshell skull and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty **even if he didn't intend** to bring bodily harm." *Id.* This fails to consider the surrounding context of the State's argument, including within the portion to which the dissent cites. As noted above, the rule was clearly invoked to address the assertions concerning causation that were raised by Konkle's expert. Even within the cited portion of the State's argument, that statement is directed to the conduct itself—the metaphorical *throwing* of the chalk at a weaker individual. And lastly, as noted previously, at the end of invoking the doctrine the State returns to clarify one final time that Konkle—not Steele—was a cause of the resulting death.[4]

Thus, because the doctrine was directed at weighing causation, and not *mens rea*, it was therefore not a misstatement of law to mention it. As a result, we conclude that no prosecutorial misconduct occurred.[5]

---

[4] The dissent further asserts that the State's argument resembles the erroneous jury instruction in *O'Bannon*, particularly where the instruction there explained that "[w]hen injury ensues from deliberate wrongdoing, **even if it is not an intended consequence**, the injurer is responsible at law without the law concerning itself with the precise amount of harm inflicted." *O'Bannon*, 274 P.3d at 997 (emphasis added). Here, had the State included a jury instruction with this language, then the dissent's point would be stronger. But in contrast to *O'Bannon*, no such instructions were given on the eggshell skull doctrine. And despite the statement clearly being directed to causation, the fact the statement was made during closing arguments fails to rise to the level of reversible misconduct where our law presumes that "any misstatement of law during closing argument is presumably cured by the trial court's final jury instructions." *Pritcher*, 208 N.E.3d at 665 (citing *Hudgins*, 451 N.E.2d at 1091).

[5] The dissent concedes that no prosecutorial misconduct took place. *See Post*, at 5 (cleaned up) ("The State argues that, even if it misstated the law, it did not amount to misconduct given the prosecutor's 'good-faith interpretation of an undecided area of law.' I tend to agree."). Specifically, the dissent acknowledges that: (1) the State's argument did not present clear signs of bad faith as required by some of our precedent, *see Highland Sales Corp. v. Vance*, 186 N.E.2d 682, 689 (Ind. 1962) (requiring a complainant show that "such misconduct is actually the product of bad faith or evil design"); (2) the eggshell skull doctrine has been previously applied within our criminal law, *see Bailey*, 979 N.E.2d at 135, 142; and (3) the State's invocation of the doctrine could easily fall within the purview

of Rule 3.1 of the Rules of Professional Conduct's express permission to make "a good faith argument for an extension, modification, or reversal of existing law." *Post*, at 5–6.

Despite this, the dissent still finds the alleged misstatement to be reversible error for two reasons: first, that it was improper for the State to argue that because Konkle "seriously injure[d]" Steele he "was aware of a high probability " that Steele could die; and second, the final jury instructions failed to cure any misstatements because they included both the "knowingly" and "intentional" *mens rea* requirements despite only "knowingly" being at issue. *Id.* Addressing the first point, the dissent does not consider the totality of the statements presented. While the State asserted that if one seriously injures another, there is a high probability of death, this statement was not the sole basis on which the State was establishing Konkle's culpability. The statement was but one example in a series presented to the jury to establish what it means to be highly aware that a particular result could occur and was ultimately intended to present context for the jury. But as is demonstrated in greater detail in the following section, the State did not simply rest on this one statement alone; rather, the State coupled these examples with facts depicting the brutality of Konkle and Steele's altercation, Konkle's demands that the witnessing employees lie about what occurred, and Konkle's attempt to flee the scene.

Addressing the second point, even if a misstatement of the law had occurred, the single mention of the "intentional" *mens rea* would not be reversible error under these facts. As our precedent dictates, "[a]n error in an instruction will not warrant reversal unless it is of such a nature that the entire charge of which it is a part misled the jury on the law of the case." *Jackson v. State*, 575 N.E.2d 617, 621 (Ind. 1991). Furthermore, "[t]he failure of a trial court to accept and give a properly tendered instruction when a serious evidentiary dispute exists is reversible error if a jury could conclude that the lesser offense was committed but not the greater." *Young v. State*, 699 N.E.2d 252, 255 (Ind. 1998). Neither of these situations dictating reversible error occurred here. The State did not present evidence or argument directed to the "intentional" *mens rea*, and nothing in the record supports a finding that the jury confused the two. In addition, the circumstances here are the exact opposite as those discussed in *Young*, particularly because the jury did not mistakenly convict Konkle of intentional murder. The plain language of both our murder and voluntary manslaughter statutes permits a conviction for establishing that a person either "knowingly **or** intentionally" killed another. *See* I.C. §§ 35-42-1-1; 35-42-1-3. In essence, this language serves as a catch-all, allowing the State to pursue a conviction on a "knowing" murder if it could not establish that the murder was intentional. The State is not going to needlessly pursue a more difficult standard if it does not need to, and nor should it. Even if the jury mistakenly looked to the intentional *mens rea* as the dissent claims, it still relied on evidence going to the "knowing" element to ultimately convict Konkle of a "knowing" murder. The only time the State would have to unequivocally demonstrate the murder was performed intentionally would be under our death penalty and LWOP statute, but this is clearly not at issue here. *See* Ind. Code § 35-50-2-9 (providing the State may pursue a death penalty or LWOP sentence by proving beyond a reasonable doubt the existence of an aggravating circumstance involving intentional murder).

## II. Sufficiency of the Evidence.

Next, we turn to address Konkle's sufficiency argument. Konkle seeks a reversal of his conviction for voluntary manslaughter, arguing that there was insufficient evidence to prove Konkle "knowingly" killed Steele. Finding the evidence sufficient, we affirm.

Our standard for reviewing evidentiary sufficiency challenges is well established, as we have made clear that "[i]t is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Teising v. State*, 226 N.E.3d 780, 783 (Ind. 2024) (quoting *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007)). "A conviction is supported by sufficient evidence if 'there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (quoting *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015)). This Court reviews only the evidence most favorable to the verdict and the reasonable inferences therefrom, and will reverse only where it is shown that "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Teising*, 226 N.E.3d at 783.

To prove Konkle guilty of voluntary manslaughter, the State was required to prove beyond a reasonable doubt that Konkle knowingly or intentionally killed Steele. *See* Ind. Code § 35-42-1-3; *id.* § -(b) ("The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder . . . to voluntary manslaughter."). Because the State conceded that there was no evidence to prove Konkle intentionally killed Steele, and because Konkle conceded that he did kill Steele, the only issue before the jury was whether Konkle acted "knowingly."

As mentioned previously, a defendant engages in conduct "knowingly" when during the course of the conduct he is aware of a high probability that a particular result could occur. *See* Ind. Code § 35-41-2-2(b). In contrast, a defendant "engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation

from acceptable standards of conduct." *Id.* § -(c). Konkle's primary argument is that his conviction should have been reduced to felony reckless homicide under Indiana Code Section 35-42-1-5 because the State failed to prove beyond a reasonable doubt that Konkle "knowingly" killed Steele.

Konkle bases this argument on the fact that he was unaware that Steele had various heart conditions. First, Konkle goes into great detail to explain the various ailments that beset Steele that were only discovered following Steele's autopsy, including cardiovascular disease, high blood pressure, an enlarged heart, and "critical stenosis" due to a 90% narrowing of the arteries, which as the State's pathologist indicated "has the potential to cause death." Konkle further points to the fact that Steele's heart showed signs of previous heart attacks, including signs of a recent heart attack due to elevated troponin levels and acute myocardial changes. Konkle cites conflicting testimony between the State's pathologist, Dr. Poulos, and the Defense's medical examiner, Dr. Nichols. Specifically, Konkle highlights testimony from Dr. Poulos suggesting that Steele had a heart attack during the altercation with Konkle, and how this testimony contrasts to Dr. Nichols' theory that Steele died naturally from all the coronary diseases present in his body. Lastly, Konkle highlights that there were no signs of either external or internal injury to Steele's neck as per Dr. Nichols' testimony.

However, while Konkle does point to reasonable conflicts in the evidence, these conflicts alone do not justify overturning Konkle's conviction, as "[i]t is not necessary that the evidence 'overcome every reasonable hypothesis of innocence.'" *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016) (quoting *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995)). Furthermore, Konkle has conflated the State's burden to prove causation with its burden to prove that Konkle "knowingly" killed Steele. It is true that the record does not show that Konkle knew about Steele's various heart conditions. But the State did not need to prove this. Rather, the State needed to prove whether Konkle engaged in conduct in which he was aware of a high probability that his conduct could kill Steele. "Knowledge and intent are both mental states and, absent an admission by the defendant, the jury must resort to the reasonable inferences from both the

direct and circumstantial evidence to determine whether the defendant has the requisite knowledge or intent to commit the offense in question." *Stubbers v. State*, 190 N.E.3d 424, 432 (Ind. Ct. App. 2022), *trans. denied*. As such, "[k]nowledge or intent may be proven by the defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points." *Id.*

Here, the evidence in the record demonstrates that on the night of Steele's death, Konkle was angry over the situation with Mother's daughter and looked to confront whoever had initiated it. Konkle first attacked Clark and became even angrier upon realizing he attacked the wrong person. After confronting Steele and getting into a fist fight, Konkle wrestled Steele to the ground, wrapping his arms around Steele's neck and laying on top of Steele's chest. While holding Steele down, Konkle hit Steele in the head several times, telling him to "go to sleep, bitch." Konkle proceeded to hold Steele in that position until Steele began gurgling, gasping for air, and foaming at the mouth. After the altercation, Konkle then asked witnessing bystanders to lie about what happened and attempted to flee from the carnival grounds. *See Stone v. State*, 555 N.E.2d 475, 477 (Ind. 1990) ("Attempts to conceal evidence may be considered by the jury as revealing consciousness of guilt."); *Myers v. State*, 27 N.E.3d 1069, 1077 (Ind. 2015) (finding that "[e]vidence of flight may be considered as circumstantial evidence of consciousness of guilt" and that "[e]vidence of an attempt to avoid arrest [also] tends to show guilt") (alteration in original).

Ultimately, we find that the State presented evidence from which a reasonable trier of fact could find beyond a reasonable doubt that Konkle was aware of a high probability that his actions could kill Steele. "It is generally presumed that a person intends the natural, necessary, and probable consequences of his or her acts." *Book v. State*, 880 N.E.2d 1240, 1252 (Ind. Ct. App. 2008), *trans. denied*. When Konkle repeatedly punched Steele in the head, compressed his chest, and deprived him of oxygen, there was a high probability that Steele could die as a result. That result came true here. We thus hold that the State presented sufficient evidence to support Konkle's conviction for voluntary manslaughter.

# III. Appropriateness of Konkle's Sentence.

Finally, Konkle requests a revision of his sentence under Indiana Appellate Rule 7(B). Examining his sentence in light of the nature of the offense and Konkle's character, we affirm the trial court.

Indiana Appellate Rule 7(B) establishes a standard of review intended to guide appellate courts when reviewing a defendant's sentence. *Cramer v. State*, 240 N.E.3d 693, 698 (Ind. 2024). The rule provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020) (quoting Ind. Appellate Rule 7(B)). "Ultimately, our constitutional authority to review and revise sentences boils down to our collective sense of what is appropriate," *Cramer*, 240 N.E.3d at 698 (quoting *Taylor v. State*, 86 N.E.3d 157, 165 (Ind. 2017)), an act that, importantly, is reserved for "exceptional" cases, *id.* (citing *Gibson v. State*, 43 N.E.3d 231, 241 (Ind. 2015)). Determining a sentence's appropriateness thus "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *McCain*, 148 N.E.3d at 985.

It is the defendant's burden to prove that "his or her sentence has met the inappropriateness standard of review." *Cramer*, 240 N.E.3d at 698 (cleaned up) (quoting *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)). And given that sentencing "is principally a discretionary function in which the trial court's judgment should receive considerable deference[,]" a trial court's sentencing decision will generally prevail "unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

## A.  Nature of the Offense

Looking first at the nature of the offense, Konkle argues that the evidence points to restraint and a lack of brutality in Steele's death, including that Konkle did not intend to kill Steele, that Konkle was unaware of Steele's poor cardiac and coronary health, and that his altercation with Steele was not aggravated by the use of weapons.

The State, however, points to surmounting evidence indicating the opposite, namely that Konkle: (1) attacked two men in one night; (2) persistently involved himself in a situation that did not concern him, despite multiple warnings to let management handle it; (3) made multiple threats of physical harm to carnival employees, including Steele; (4) engaged Steele in a physical altercation, resulting in Steele's death; (5) asked carnival employees to lie about what took place; and (6) attempted to flee the scene.

We find that the combination of these events show that the underlying offense was more than just a mere fist fight. *See Chastain v. State*, 165 N.E.3d 589, 601 (Ind. Ct. App. 2021) (finding misconduct, both charged and uncharged, is a relevant consideration at sentencing), *trans. denied*. Moreover, Konkle's statement that if he "hit the wrong person the first time the other one's going to get it twice as worse," and later, telling Steele to "go to sleep, bitch," further negate Konkle's argument that he displayed a lack of brutality. Lastly, the altercation involved Konkle wrestling Steele to the ground, laying on top of Steele with his chest compressed, punching Steele in the back of the head five times, and holding him in that position until Steele began gurgling and foaming at the mouth.

Given the totality of these facts, Konkle fails to show the offense involved restraint or a lack of brutality. *See Stephenson*, 29 N.E.3d at 122.

## B.  Character of the Offender

Turning next to the nature of the defendant's character, we engage in a broad analysis of the defendant's "qualities, life, and conduct." *Cramer*, 240 N.E.3d at 699 (quoting *Crabtree v. State*, 152 N.E.3d 687, 705 (Ind. Ct.

App. 2020), *trans. denied*). Based on the evidence provided, however, we find that Konkle failed to prove that his sentence was inappropriate in light of his character.

Konkle notes testimony from his family indicating that he (1) was thirty-three years old at the time of his sentencing; (2) had six dependent children and was paying child support; (3) was described as a good man; (4) has the support of his family and a plan to seek anger management; (5) has a stable home to return to following his release from incarceration; (6) is the father of a special needs child with autism; (7) has demonstrated remorse for his actions; and (8) is plagued by visions of his crime.

The State rebuts Konkle's assertion of his good character by indicating that as a juvenile, Konkle was adjudicated a delinquent for domestic battery, and further, had violated his probation on numerous occasions for either failing drug screens or engaging in violent behavior with his other family members. The State also highlights Konkle's adult criminal history, including convictions for sexual misconduct with a minor, battery, battery resulting in bodily injury, and operating a vehicle without a license. The significance of a criminal sentence in assessing a defendant's character "is measured by the number of prior convictions and their gravity, by their proximity or distance from the present offense, and by any similarity or dissimilarity to the present offense that might reflect on a defendant's culpability." *Bryant v. State*, 841 N.E.2d 1154, 1156 (Ind. 2006); *see also Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007) (further noting a defendant's age "is highly relevant in determining the weight to be given to a defendant's criminal history or lack thereof"). Here, Konkle's prior battery and domestic violence charges appear directly pertinent to the current offense. *See Vazquez v. State*, 762 N.E.2d 92, 97 (Ind. 2001) (affirming sentence for murder where criminal history reflected an escalation of violence). And while the record of Konkle's other charges may not be directly related to the current offense, "it is appropriate to consider such a record as a poor reflection on the defendant's character, because it may reveal that he or she has not been deterred after having been subjected to the police authority of the State." *Rutherford*, 866 N.E.2d at 874 (citing *Cotto v. State*, 829 N.E.2d 520, 526 (Ind. 2005)). The record

before us reflects that Konkle, both as a juvenile and as an adult, has a repeated history of disregard for the ramifications of his actions.

The State further points to evidence contradicting Konkle's assertions that he felt remorse for Steele's death. While incarcerated for the current offense, Konkle instructed his brother to threaten another man and tell him that "I'm not going to be in here long and it will be twice as bad for him if I have to come in there." In addition, Konkle joked about having "beat up two people in one night."

While Konkle's assertions of his remorse and desire to address his anger issues are duly noted, the evidence nonetheless supports his sentence. The trial court, having considered these and other facts, imposed a thirty-four-year sentence (twenty-four years for voluntary manslaughter and ten years for the habitual offender enhancement). Moreover, Konkle's aggregate sentence was below the maximum sentence allowed by law. *See* Ind. Code §§ 35-50-2-4.5 (providing a sentencing range between ten and thirty years for conviction of a Level 2 felony); 35-50-2-8(h)(i)(1) (providing a sentencing range between eight and twenty years for habitual offenders convicted of a Level 2 felony).

Therefore, in light of both the nature of the offense and Konkle's character, we find that the overall length of Konkle's sentence is appropriate. *See McCain*, 148 N.E.3d at 985 (upholding a forty-five-year sentence for voluntary manslaughter with a firearm enhancement as appropriate under Appellate Rule 7(B)).

## Conclusion

For the reasons articulated above, we affirm Konkle's conviction, including the thirty-four-year sentence.

Rush, C.J., and Slaughter and Molter, JJ., concur.
Goff, J., concurs in part and dissents in part with separate opinion.

ATTORNEY FOR APPELLANT ZACHARIAH KONKLE

R. Patrick Magrath
Madison, Indiana

ATTORNEYS FOR APPELLEE STATE OF INDIANA

Theodore E. Rokita
Attorney General of Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana

Daylon L. Welliver
Deputy Attorney General
Indianapolis, Indiana

Angela N. Sanchez
Chief Counsel of Appeals
Indianapolis, Indiana

**Goff, J., concurring in part and dissenting in part.**

I take no issue with the Court's well-reasoned holding on the appellate-preservation rule—a holding that aligns with deep-seated criticism by Indiana courts and commentators and with most other jurisdictions, not to mention Trial Rule 46, which deems "unnecessary" any "formal exceptions to rulings or orders of the court."

Despite my agreement with the Court's resolution of this procedural issue, I part ways with the Court on the merits of Konkle's claim. In my view, the Court unnecessarily expands the eggshell-skull doctrine to homicide cases requiring proof of a knowing or intentional *mens rea*, and—unnecessary expansion aside—it misapplies that doctrine to Konkle. For these reasons, I would hold that the prosecutor's misstatement of the law, though not necessarily misconduct, amounted to reversible error, thus entitling Konkle to relief.

## I. The Court unnecessarily expands the eggshell-skull doctrine to homicide cases requiring proof of a knowing or intentional *mens rea*.

In finding no reversible error from the prosecutor's invocation of the eggshell-skull doctrine, the Court looks first to the doctrine's application in our own criminal jurisprudence. *Ante*, at 17–20.[1] Recognizing that the "doctrine has not been applied to murder or its kindred in this state," the Court then turns to cases from other jurisdictions for "guidance," *id.* at 20, relying principally on *Brackett v. Peters*, 11 F.3d 78 (7th Cir. 1993) and *State v. O'Bannon*, 274 P.3d 992 (Utah Ct. App. 2012). These cases, I agree, support the Court's general conclusion that, while the doctrine "should

---

[1] *See Bailey v. State*, 979 N.E.2d 133, 135, 142 (Ind. 2012) (using the eggshell-skull metaphor when discussing the "results in bodily injury" enhancing circumstance in felony domestic battery); *Defries v. State*, 342 N.E.2d 622, 629–30 (Ind. 1976) (using the eggshell-skull metaphor while holding that the aggravated-assault statute did not require specific intent to cause great bodily harm).

**not** be construed to alleviate the State's burden to prove any requisite intent elements," it may be invoked for proving causation. *Ante,* at 24. But neither case, in my view, lends support to the Court's expansion of the eggshell-skull doctrine to homicide cases requiring proof of a knowing or intentional *mens rea.*

In *Brackett,* the Seventh Circuit Court of Appeals applied the doctrine to a case involving felony murder, where "the death must be caused by the felony." 11 F.3d at 81–82. By contrast, the court there observed, the doctrine "does not quite fit" in cases of intentional murder, because the "murderer must intend his victim's death and ordinarily this will presuppose some awareness of the likely consequences of his act." *Id.* Simply put, the court added, it "is not murder to kill a person by a slight blow harmless to an ordinary person if you do not know the person is unusually vulnerable." *Id.* "But *felony murder is different,*" the court reasoned, due to the absence of an intent-to-kill element the state must prove, thus making application of the doctrine proper in that case.[2] *Id.* at 82 (emphasis added).

Unlike in *Brackett,* the charges in *O'Bannon did* require the state to prove a knowing or intentional *mens rea.* 274 P.3d at 1001. But the defendant in *O'Bannon* faced allegations of second-degree felony child abuse—not murder, where the stakes are much higher for the defendant. *See id.* at 994. If anything, the outcome in *O'Bannon* should counsel *against* the application of the eggshell-skull doctrine to homicide cases requiring proof of a knowing or intentional *mens rea.* The trial court in that case instructed the jury on the doctrine, explaining that, "[w]hen injury ensues from deliberate wrongdoing, even if it is not an intended consequence, the injurer is responsible at law without the law concerning itself with the

---

[2] The Court insists that *Brackett* "did not single out felony murder" for the doctrine's application. *Ante,* at 26. But the language quoted above clearly suggests otherwise. What's more, the precedent on which the opinion in *Brackett* relied refutes the Court's suggestion that the doctrine doesn't apply to cases of knowing murder. *See People v. Brackett,* 510 N.E.2d 877, 880 (Ill. 1987) (acknowledging the presumption in Illinois that one who beats another with his bare fists does not intend to kill the victim or "know his acts created a strong probability of death").

precise amount of harm inflicted." *Id.* at 997. In reversing the conviction, the Utah Court of Appeals found the instruction misleading because it confused the requisite mental state. If a person did not intend to cause a child serious physical injury or "know" that their conduct was "reasonably certain to cause serious physical injury," the court explained, "then he or she cannot be found guilty of intentionally or knowingly causing serious physical injury to the child, even if the child is unusually vulnerable." *Id.* at 1002.

The Court here seems to recognize the potential risk of confusion over the doctrine's application, though it attempts to placate any concerns by "strongly recommend[ing] that the doctrine be accompanied by a jury instruction adequately explaining the doctrine's scope and applicability." *Ante*, at 25. But considering the high stakes at play in a prosecution for homicide, I would avoid potential confusion by precluding the doctrine's application altogether in homicide cases requiring proof of a knowing or intentional *mens rea*.

## II. The Court misapplies the doctrine to Konkle.

Turning to the doctrine's application here, the Court finds no misconduct "because the doctrine was directed at weighing causation, and not *mens rea*." *Id.* at 27. In reaching this conclusion, the Court insists that "the doctrine was not invoked" in explaining "whether Konkle was aware of a high probability that his conduct would result in Steele's death." *Id.* at 26. Rather, the Court submits, the prosecutor invoked the doctrine "to combat Konkle's argument that Steele's death was purely a result of his coronary artery disease." *Id.* In my view, the record strongly suggests otherwise.

To reiterate, the State in closing argued that "if one throws a piece of chalk at a victim with an eggshell skull and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty *even if he didn't intend* to bring bodily harm." Tr. Vol. 4, pp. 27–28 (emphasis added). Those remarks amount to a statement about the standard of intent, not causation. And it's incorrect to apply this rule to the intent element of a homicide: one does not "knowingly" kill whenever one makes an assault

that results in death.[3] *See, e.g., McEwen v. State*, 695 N.E.2d 79, 87 (Ind. 1998) (distinguishing a knowingly murderous assault with a knife to the victim's head or chest from the "mere touching" that might prove only involuntary manslaughter) (internal citation and quotation marks omitted).

Ironically, these remarks by the State are analogous to the jury instruction held improper in *O'Bannon*, the Utah case on which the Court relies in finding the doctrine applicable here. *Compare* Tr. Vol. 4, pp. 27–28 (State arguing that "if one throws a piece of chalk at a victim with an eggshell skull and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty *even if he didn't intend* to bring bodily harm") (emphasis added), *with O'Bannon*, 274 P.3d at 997 (instruction on the eggshell-skull rule explaining that "[w]hen injury ensues from deliberate wrongdoing, *even if it is not an intended consequence*, the injurer is responsible at law without the law concerning itself with the precise amount of harm inflicted") (emphasis added).

In short, if the Court had focused its analysis on the actual remarks by the State that prompted the objection, it should have concluded—based on the very precedent it relies on—that the State's arguments in closing amounted to a misstatement of the law.

---

[3] Rather than acknowledge the risk of confusion inherent in an argument by the State *directly linking* the doctrine to the standard of intent, the Court insists that my conclusion "fails to consider the surrounding context" of the challenged statement, adding that "the rule was *clearly* invoked to address the assertions concerning causation that were raised by Konkle's expert." *Ante*, at 27 (emphasis added). But if circumstances like those here are so clear, why even "caution parties who invoke the eggshell skull doctrine" in homicide cases to clarify that it has "no place for proving the requisite mental state"? *See id.* at 24–25.

## III. Though not necessarily misconduct, the prosecutor's misstatement of the law amounted to reversible error.

When reviewing a claim of prosecutorial misconduct, an appellate court determines (1) whether misconduct occurred in fact, and if so, (2) whether the misconduct, under the circumstances, "placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (internal citation and quotation marks omitted). Whether misconduct occurred in fact "is measured by reference to case law and the Rules of Professional Conduct." *Id.* And the "gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Id.* (emphases omitted).

The State argues that, even if it misstated the law, it did not amount to misconduct given the prosecutor's "good-faith interpretation of an undecided area of law." Pet. to Trans. at 14. I tend to agree.

Though case law in Indiana isn't entirely clear, *see McCoy v. State*, 574 N.E.2d 304, 308 (Ind. Ct. App. 1991) (declining to find that the "prosecutor *purposefully* misstated the law" but nevertheless "[a]ssuming" that the defendant showed "improprieties under case law or canons of conduct"), some precedent suggests that prosecutorial misconduct requires a showing of bad faith, *see Highland Sales Corp. v. Vance*, 186 N.E.2d 682, 689 (Ind. 1962) (stressing that the complainant must show that "such misconduct is actually the product of bad faith or evil design"); *Clover v. State*, No. 03A04–1010–CR–675, 2011 WL 3805868, at *2 (Ind. Ct. App. Aug. 26, 2011) (finding no prosecutorial misconduct where the "State was guilty

of being sloppy" but otherwise demonstrated "no bad faith") (internal citation to record and quotation marks omitted) (mem.).[4]

Though it's a stretch to say that the prosecutor's comments on the eggshell-skull doctrine "were 100% consistent with" this Court's precedent, *see Konkle v. State*, 227 N.E.3d 212, 224 (Ind. Ct. App. 2024) (Bradford, J., dissenting), it's clear that this Court has applied the doctrine to the broad realm of the criminal law, *see, e.g.*, *Bailey v. State*, 979 N.E.2d 133, 135, 142 (Ind. 2012). And, as the State points out, Rule 3.1 of the Rules of Professional Conduct expressly allows attorneys to make "a good faith argument for an extension, modification or reversal of existing law."

Lack of prosecutorial misconduct notwithstanding, I still consider the prosecutor's misstatement of the law to be reversible error.

The State questions the impact of the eggshell-skull comment on the jury, arguing that the evidence tended to show the co-worker more likely died of asphyxiation than by heart attack and that Konkle's actions (choking the co-worker till he convulsed and gurgled) showed he knew he was likely to kill him. The State also relies on the proper jury instruction on the "knowingly" *mens rea* and the "strong presumption" that a jury obeys correct instructions. Pet. to Trans. at 17 (internal citation omitted).

These arguments fall short, in my view.

To begin with, the prosecutor not only misstated the law, he also compounded that misstatement by first arguing—improperly—that because Konkle "seriously injure[d]" the co-worker, he was "aware of a high probability" that the co-worker could die. Tr. Vol. 4, p. 18. *Cf. Pritcher v. State*, 208 N.E.3d 656, 664 (Ind. Ct. App. 2023) (finding a similar

---

[4] Courts in some other states, by contrast, have held that a "finding of misconduct does not require a determination that the prosecutor acted in bad faith or with wrongful intent." *People v. Kennedy*, 115 P.3d 472, 490 (Cal. 2005), *disapproved of on other grounds by People v. Williams*, 233 P.3d 1000 (Cal. 2010). *Cf. State v. Glenn*, 481 A.2d 741, 746 (Conn. 1984) (stressing that "considerable weight" should be given to prosecutor's bad faith but that a showing of good faith is not necessarily determinative in establishing misconduct).

misstatement of the law and stressing that the "State had to prove that [defendant] was aware of a high probability that his conduct would kill").

Second, I disagree that the final jury instructions cured the misstatement of law. Yes, those instructions included a definition of the "knowingly" *mens rea*. And, yes, they told the jury that the instructions were their "best source in determining the law." Tr. Vol. 4, pp. 45–46. But the final instructions also defined the lesser-included offense of voluntary manslaughter as the knowing or intentional killing of another while acting under sudden heat. And they included a definition of the "intentionally" *mens rea*. *Id.* at 42–43. The State, of course, conceded the absence of an intentional killing. But the court, in its final instructions, appears not to have reiterated that fact. By setting forth both the "knowing or intentional" *mens rea*, despite only the knowing *mens rea* being at issue, the instructions arguably caused even more confusion for the jury.

In short, the prosecutor's misstatement of the law, though not necessarily misconduct, amounted to reversible error, thus entitling Konkle to relief.

# Conclusion

For the reasons above, I concur in part and dissent in part from the Court's opinion.